## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1. KYLE GOINS, | ) |
| 2. KARI GOINS, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No.:17-cv-347-JHP-JFJ |
| | ) |
| 1.CSAA FIRE & CASUALTY INSURANCE | ) |
| COMPANY, a foreign for profit Insurance | ) |
| Corporation, | ) |
| | ) |
| Defendant. | ) |

## PLAINTIFFS' REPLY IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW the Plaintiffs, Kyle Goins and Kari Goins, by and through their attorneys of record, respectfully requesting that this Court deny Defendant's Motion for Summary Judgment. Genuine issues of material fact exist which preclude summary adjudication of Plaintiffs' bad faith claim. Further, a reasonable jury could conclude, based on the evidence, that Defendant's investigation, evaluation, and denial of Plaintiffs' wind damage claim was unreasonable, thus summary judgment is not proper. In support of this proposition, Plaintiffs submit the following brief:

Respectfully submitted,

/s Matthew M. McGrew
Matthew M. McGrew, OBA # 32065
McGrew, McGrew & Associates, P.C.
400 N. Walker, Suite 115
Oklahoma City, Oklahoma 73102
Telephone: (405) 235-9909
Fax: (405) 235-9929
E-mail Address: mcgrewslaw@yahoo.com
**Counsel for Plaintiffs**

## TABLE OF CONTENTS

**FACTUAL AND PROCEDURAL OVERVIEW**............................................ **P.1**

**PLAINTIFFS' RESPONSE TO DEFENDANT'S
STATEMENT OF FACTS**....................................................................**P.4**

**PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL
FACTS WHICH PRECLUDE THE ISSUANCE
OF SUMMARY JUDGMENT**..........................................................**P.9**

## ARGUMENT AND AUTHORITY

**I: SUMMARY JUDGMENT STANDARD**…………………………………**P.16**

**II: DEFENDANT IS NOT ENTITLED TO SUMMARY ADJUDICATION OF
PLAINTIFFS' BAD FAITH CLAIM**…...…………………………..…..**P.17**

> **A: Jury questions exist as to the reasonableness of Defendant's conduct
> during the investigation, evaluation, and payment of Plaintiffs'
> claim**…………………..…………………………………………...**P.17**

> **B: Defendant's claim that a "legitimate dispute" exists is not
> supported by the evidence**……………………………………………**P.22**

**III: DEFENDANT'S ARGUMENTS WITH RESPECT TO PUNITIVE DAMAGES
ARE PREMATURE. NONETHELESS, THE EVIDENCE IN THIS CASE
WARRANTS A PUNITIVE DAMAGE INSTRUCTION**………………….**P.24**

**IV: CONCLUSION**…………………………………………...…………… **P.25**

## **TABLE OF AUTHORITIES**

<u>**CASES**</u>

<u>Alsobrook v. National Travelers Life Insurance Company</u>, 852 P.2d 768, 770 (Okl. 1992)……………………………………………………….….…..…17, 21

<u>Anderson v. Liberty Lobby, Inc</u>., 477 U.S. 242, 248 (1986)……………………..…...16

<u>Anson v. Erlanger Minerals and Metals</u>, 702 P.2d 393, 398 (Okl.App. 1985)……...…...16

<u>Capstick v Allstate Ins. Co</u>. (1993, CA10 Okla) 998 F2d 810…………………….…..…24

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986)…………………………….….…...16

<u>Christian v. American Home Assurance Company</u>, 577 P.2d 899, 904 (Okl. 1977…17, 23

<u>Conti v. Republic Underwriters Ins. Co</u>., 782 P.2d 1357, 1360 (Okl. 1989)………..……17

<u>Del State Bank v. Salmon</u>, 1976 OK 42, 548 P.2d 1024…………………………….…..24

<u>Hatfield v. Liberty Mutual Ins. Co</u>., 98 F.App'x 789, 794 (10th Cir. 2004)…………..…24

<u>Martin v. Chapel, et al</u>, 637 P.2d 81 (Okl.1981)…………..…………………..………….16

<u>Mustang Fuel Corp. v. Youngstown Sheet & Tube Co</u>., 561 F.2d 202 (10th Cir. 1977)…………………………………………………………..…. ………………..16

<u>Northrip v. Montgomery Ward and Company</u>, 529 P.2d 489(Okl.1974)……… ……… 16

Schonwald v. Ragains, 1912 OK 210, 32 Okla. 223, 122 P. 203………………………..24

Timberlake Construction Co. v. U.S. Fidelity & Guaranty Co., 71 F.3d 335, 344 (10th Cir. 1995)………………………………………………………………...…..17, 21

Tuffy's, Inc. v. City of Oklahoma City, 2009 OK 4, ¶ 14, 212 P.3d 1158…………..…..24

Vining v. Enterprise Financial Group, Inc., 148 F.3d 1206, 1213 (10th Cir. 1998)…17, 19

Weaver v. Pryor Jeffersonian, 569 P.2d 967, 974 (Okl.1985) …………………………..16

**STATUTES**

Fed.R.Civ.P. 56(c) …………………………………………………....……….16

## FACTUAL AND PROCEDURAL OVERVIEW

Plaintiffs, Kyle and Kari Goins, own a home located in Sand Springs, Oklahoma. On July 15, 2016, Plaintiffs' home was damaged in a wind storm. A claim was submitted to Defendant CSAA, Plaintiffs' insurer, for the damages. The case arises from the Defendant's unreasonable handling and wrongful denial of the Goins' property insurance claim.

The July 15, 2016 wind storm caused the majority of the Goins' shingles to become separated and unsealed at their adhesive strips. Additionally, the wind pulled many shingles through their fasteners. By way of background, composition shingles are installed in horizontal courses, with the overlaying course adhering to the shingles beneath it with an adhesive sealant strip on the bottom side of the shingle:



The sealing of the adhesive strip serves as the primary shield against water intrusion and allows the roofing system to keep out the elements. The adhesive strips on the Goins' roof are freshly unsealed, with granular transfer from the underlying shingle to the adhesive strip of the overlaying shingle, demonstrating that the shingles had been properly adhered prior to the wind storm at issue:

1



Once the sealant strip is compromised and exhibits granular transfer, the shingle cannot reseal or re-adhere. Ultimately, Defendant denied the claim and refused to pay for replacement of the Goins' obviously wind damaged roof. Defendant's investigation and evaluation of the Goins' claim was unreasonable and is part of a widespread pattern and practice of CSAA refusing to acknowledge and issue payment for direct physical damage caused by wind.

CSAA conducted two unreasonable inspections of Plaintiffs' roof during the claim process. The first inspection was conducted by CSAA adjuster, Shane Haar. Mr. Haar admitted in his deposition that, despite the fact that Plaintiffs' claim was brought for damage resulting from a wind storm, he never examined any shingles for wind damage during his inspection. Further, Mr. Haar never inspected the underside of Plaintiffs' shingles to look for granular transfer, windblown debris, installation issues, or unsealing by wind. Mr. Haar unreasonably failed to conduct this basic wind damage assessment of the Plaintiffs' roof, even though his own inspection revealed collateral wind damages, including gutters, a backyard gate, and a roof exhaust which had been damaged by wind.

2

Defendant's second and final inspection occurred on May 15, 2017, after Plaintiffs had requested a re-inspection to address the wind damage to their roof. CSAA's adjuster, Mickey Manzer, inspected the Plaintiffs' roof the second time, along with Plaintiffs' contractor, Ryan Smith. Prior to the inspection, Mr. Manzer stated that he couldn't replace the Plaintiffs' roof on wind damage because CSAA only pays for wind damage if the shingles have creased, torn, or been blown from the roof. After the inspection, Mr. Manzer stated that he agreed Plaintiffs' roof was damaged by wind and that "every other insurance company would probably buy this roof", but that he could not write it up for replacement due to CSAA's strict practice of not paying for wind damages. Mr. Manzer also suggested that Plaintiffs should "change insurance carriers", wait for another storm, and submit the claim to a new carrier to pay for the damages that occurred during CSAA's policy period. CSAA's refusal to indemnify the Goins for their covered wind damage is not an isolated incident. CSAA is engaged in a bad faith pattern and practice of denying or unreasonably limiting payment for wind claims on composition shingled roofing systems. Although CSAA's claim handling guidelines acknowledge and its own adjusters all admit that wind can cause unsealing of laminated shingles, CSAA's pattern and practice is to not issue payment for unsealed shingles unless they have been blown from the roof, torn, or creased, despite the fact that unsealing is clearly "direct physical loss" and thus owed under the terms and conditions of the policy.

In its Motion for Summary Judgment, CSAA asks this Court to dispose of Plaintiffs' bad faith claim. As discussed at length below, the record is rife with evidence of CSAA's unreasonable, bad faith conduct during the investigation, evaluation, and denial of Plaintiffs' claim. A reasonable jury could conclude, based on this evidence, that Defendant acted in bad faith. Further, genuine issues of material fact exist which preclude summary adjudication of

3

Plaintiffs' bad faith claim. Thus, summary judgment is not proper. Defendant's Motion should be denied and this matter should proceed to be decided by a jury.

## PLAINTIFFS" RESPONSE TO DEFENDANTS' STATEMENT OF FACTS

**1. Admitted.**

**2. Admitted.** Plaintiffs admit that Defendant has accurately cited portions of the insurance policy.

**3. Admitted.** Plaintiffs admit that Defendant has accurately cited portions of the insurance policy.

**4. Admitted.** Plaintiffs admit that Defendant has accurately cited portions of the insurance policy.

**5. Admitted.**

**6. Admitted in Part, Denied in Part.** Plaintiffs admit that, upon notice of the claim, Defendant conducted an investigation and evaluation of that claim. However, and as discussed at length in this motion, Defendant's investigation, evaluation, and eventual denial of Plaintiffs' claim was unreasonable.

**7. Admitted.**

**8. Admitted in Part, Denied in Part.** Plaintiffs admit that Defendant's adjuster, Mr. Haar, inspected their home on December 11th, 2016. However, Mr. Haar's inspection was not reasonable and did not include any wind damage assessment of the shingles.

**9. Admitted in Part, Denied in Part.** Plaintiffs admit that Defendant's adjuster, Mr. Haar, inspected their home on December 11th, 2016. However, Mr. Haar's inspection was not reasonable and did not include any wind damage assessment of the shingles. Further, Brian with T-Town Roofing did not agree with Mr. Haar's findings that the roof had minimal damage. (See

4

Exhibit 1, Deposition of Kyle Goins, Page 77, Lines 20-25).

**10. Admitted in Part, Denied in Part.** Plaintiffs admit that Defendant has accurately cited a portion of Mr. Haar's claim notes. However, Mr. Haar was clear in his deposition that his inspection did not include any wind damage assessment of the shingles. Further, the five shingles mentioned in Mr. Haar's claim note are shingles which were blown off the roof during the July 15th, 2016 storm. (See Exhibit 1, at Page 36, Lines 9-16; Page 42, Lines 4-18; Page 43, Line 25; Page 44, Lines 1-3; Page 45, Lines 17-19; Page 49, Lines 19-25; Page 63, Lines 8-14).

**11. Admitted in Part, Denied in Part.** Plaintiffs admit that Defendant has accurately cited a portion of Mr. Haar's deposition testimony. However, the five shingles mentioned in Mr. Haar's claim note are shingles which were blown off the roof during the July 15th, 2016 storm.

**12. Denied.** After the December 11th, 2016 inspection, Mr. Haar encouraged Plaintiffs to withdraw their claim because, after a cursory inspection which included no wind damage assessment, he concluded that the roof was damaged but not enough as far as AAA was concerned to pursue the claim. Mr. Haar also told Plaintiffs that the claim would raise their "rates." (See Exhibit 1, at Page 74, Lines 20-25; Page 76, Lines 4-9; Page 78, Lines 19-23).

**13. Denied.** At that time, Mr. Goins was afraid that his rates would go up and did withdraw the claim. However, Brian with T-Town Roofing did not agree with Mr. Haar and maintained that the Plaintiffs' roof was totaled by wind. (See Exhibit 1, at Page 77, Lines 20-25).

**14. Admitted.**

**15. Admitted in Part, Denied in Part.** Plaintiff did call CSAA to confirm that he would withdraw his claim. All other allegations in this paragraph are denied.

**16. Admitted in Part, Denied in Part.** Plaintiff did call CSAA to reopen his claim and stated that he disagreed with CSAA's assessment and that the roof is damaged by wind. CSAA

requested that Plaintiffs provide photographs of the damage, which Plaintiffs did. After these photographs were submitted, a re-inspection was scheduled. All other allegations in this paragraph are denied.

**17. Admitted in Part, Denied in Part.** See Plaintiffs' response to Paragraph No. 16 above.

**18. Admitted.**

**19. Admitted in Part, Denied in Part.** Plaintiffs' contractor, Ryan Smith, contacted CSAA representative Andrew Smith and told him that Plaintiffs' roof had severe wind damage which had been missed during the first inspection, and that the neighborhood had significant damage from high winds. Ryan Smith then forwarded photographs of some of the wind damage to CSAA and a re-inspection was scheduled. All other allegations in this paragraph are denied.

**20. Admitted.**

**21. Admitted.**

**22. Admitted.**

**23. Admitted in Part, Denied in Part.** Plaintiff Kyle Goins, Plaintiffs' contractor Ryan Smith, and CSAA's adjuster Mickey Manzer attended the re-inspection. Although Mr. Manzer's report erroneously states that the shingles are installed with only three nails, Mr. Manzer admitted on site that the Plaintiffs' roof was totaled by wind and that any carrier other than CSAA would pay to replace the roof. (See Exhibit 1 at Page 96, Lines 8-25; Page 97, Lines 1-12; Page 99, Lines 1-25, Page 100, Lines 1-22). (See also, Exhibit 2, Deposition of Ryan Smith, Page 35, Lines 22-25; Page 36, Lines 1-24; Page 37, Lines 9-18).

**24. Admitted in Part, Denied in Part.** Plaintiffs admit that the quoted portions of Mickey Manzer's report are accurately cited. However, see Plaintiffs' response to Paragraph No. 23 above.

**25. Admitted in Part, Denied in Part.** Plaintiffs admit that the quoted portions of Andrew Smith's claim note are accurately cited. However, see Plaintiffs' response to Paragraph No. 23 above.

**26. Admitted.**

**27. Admitted.**

**28. Admitted.**

**29. Admitted.**

**30. Denied.** While Mr. Manzer's loss report notes "improper shingles installation issues", he never told Mr. Goins that he observed installation issues on his roof or believed the roof was improperly installed. Mr. Manzer told Mr. Goins that the roof was totaled because of wind damage and that, if it were up to him, he would issue payment to replace the roof. (See Exhibit 3, Loss Report, at CSAA_GOINS 0177). (See also, Exhibit 1, at Page 108, Lines 22-25; Page 109, Lines 1-11). Further, Mr. Manzer's loss report identifying "improper installation" states that it is consistent with Mr. Haar's findings of improper installation, which Mr. Haar admitted in his deposition he never made. To the contrary, Mr. Haar testified in his deposition that he did not observe any evidence of improper installation or manufacturing defect during his inspection. (See Exhibit 4, Deposition of Shane Haar, Page 106, Lines 6-24). Further, CSAA's adjuster Andrew Smith, who sent Plaintiffs a denial letter stating that CSAA "determined that the damage was caused by overdriven fasteners into the shingles" later testified that that the photographs taken by Mickey Manzer at the re-inspection showed that the shingles had become unsealed recently due to a weather event. (See Exhibit 5, Deposition of Andrew Smith, Page 71, Lines 2-15; Page 72, Lines 3-5; Page 72, Lines 22-25; Page 73, Lines 1-10).

**31. Denied.** This case is not centered around a dispute regarding causation, as Defendant claims,

7

but rather around CSAA's pattern and practice of disregarding wind damage to composition shingled roofing systems. See Plaintiffs' Response to Paragraph No 30 above for additional information responsive.

**32. Admitted.**

**33. Admitted.**

**34. Admitted.**

**35. Admitted in Part, Denied in Part.** Plaintiffs admit that the quoted portions of Mr. Berryman's report are accurately cited. However, the factual allegations contained in this paragraph are denied. (See Exhibit 6, Expert Report of Dr. Christopher Ramseyer, Ph.D., P.E.). (See also, Exhibit 1, at Page 96, Lines 8-25; Page 97, Lines 1-12; Page 99, Lines 1-25, Page 100, Lines 1-22). (See also, Exhibit 2, at Page 35, Lines 22-25; Page 36, Lines 1-24; Page 37, Lines 9-18).

**36. Admitted in Part, Denied in Part.** Plaintiffs admit that the quoted portions of Mr. Berryman's report are accurately cited. However, the factual allegations contained in this paragraph are denied. See Plaintiffs' Response to Paragraph No 35 above for additional information responsive.

**37. Admitted in Part, Denied in Part.** Plaintiffs admit that the quoted portions of Mr. Berryman's report are accurately cited. However, the factual allegations contained in this paragraph are denied. See Plaintiffs' Response to Paragraph No 35 above for additional information responsive.

**38. Admitted in Part, Denied in Part.** Plaintiffs admit that the quoted portions of Mr. Berryman's report are accurately cited. However, the factual allegations contained in this paragraph are denied. See Plaintiffs' Response to Paragraph No 35 above for additional

information responsive.

**39. Admitted in Part, Denied in Part.** Plaintiffs admit that the quoted portions of Mr. Berryman's report are accurately cited. However, the factual allegations contained in this paragraph are denied. See Plaintiffs' Response to Paragraph No 35 above for additional information responsive.

**40. Admitted in Part, Denied in Part.** Plaintiffs admit that the quoted portions of Mr. Berryman's report are accurately cited. However, the factual allegations contained in this paragraph are denied. See Plaintiffs' Response to Paragraph No 35 above for additional information responsive.

**41. Admitted in Part, Denied in Part.** Plaintiffs admit that the quoted portions of Mr. Berryman's report are accurately cited. However, the factual allegations contained in this paragraph are denied. See Plaintiffs' Response to Paragraph No 35 above for additional information responsive.

## PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS IN CONTROVERSY WHICH PRECLUDE THE ISSUANCE OF SUMMARY JUDGMENT

**1.** Plaintiffs purchased a homeowners insurance policy from Defendant, CSAA Fire & Casualty Insurance Company (commonly known as "AAA"), which provided coverage for their home located at 514 W. 54th Street in Sand Springs, Oklahoma. (See Exhibit 7, Excerpts of Certified Copy of Insurance Policy and Declarations)

**2.** The policy provided coverage for "direct physical loss" caused by wind. (See Exhibit 7, at Perils Insured Against, CSAA_GOINS 0408)

**3.** On July 15, 2016, the Plaintiffs' home sustained damage as a result of a wind storm. After the wind storm, Plaintiffs noticed shingles in their yard and five missing shingles on their roof. The storm also blew a portion of Plaintiffs' gutters off and broke their backyard gate. (See Exhibit 1,

9

at Page 36, Lines 9-16; Page 42, Lines 4-18; Page 43, Line 25; Page 44, Lines 1-3; Page 45, Lines 17-19; Page 49, Lines 19-25; Page 63, Lines 8-14).

**4.** The wind storm also damaged many homes in Plaintiffs' neighborhood, including Plaintiffs' next door neighbor. These neighbors had their roofs replaced as a result of the storm. (See Exhibit 1, at Page 59, Lines 6-10; Page 60, Lines 1-8). (See also, Exhibit 2, at Page 14, Lines 20-25; Page 15, Lines 1-25; Page 16, Lines 1-21; Page 18, Lines 21-25; Page 19, Lines 1-19).

**5.** Plaintiffs' submitted a claim to CSAA for wind damage. CSAA assigned adjuster Shane Haar to inspect the Plaintiffs' property. Mr. Haar inspected the Plaintiffs' property on December 11th, 2016.

**6.** CSAA's written guidelines for wind damage inspection state that ████████████████ ████████████████████████████████████████████ ████████████████████████████ (See Exhibit 8, CSAA Structural Property Estimating Guidelines Regarding "Wind Damage", at CSAA_GOINS 0370).

**7.** Mr. Haar's claim note summarizing his inspection states "the inspection revealed that the cause of loss is due to wind, hail and wind driven rain" and that "[a]ll slopes were inspected for wind and hail damage." (See Exhibit 9, Claim Notes, at CSAA_GOINS 0205-0206).

**8.** Mr. Haar testified in his deposition that, despite the fact that Plaintiffs' claim was brought for damage resulting from a wind storm, he never examined any shingles for wind-damage during his inspection. (See Exhibit 4, at Page 44, Lines 2-25; Page 45, Lines 1-2; Page 66, Lines 2-14; Page 67, Lines 16-21; Page 68, Lines 12-25; Page 69, Lines 1-5; Page 72, Lines 8-25; Page 73, Lines 1-16; Page 83, Lines 5-10; Page 83, Line 25; Page 84, Lines 1-6; Page 97, Lines 8-11; Page 98, Lines 12-19). Further, Mr. Haar never inspected the underside of Plaintiffs' shingles to look for granular transfer, windblown debris, installation issues, or unsealing by wind.

**9.** Mr. Haar testified in his deposition that he did not observe any overdriven or underdriven nails on the Plaintiffs' roof. (See Exhibit 4, at Page 44, Lines 2-6).

**10.** Mr. Haar testified in his deposition that he never looked under the shingles to see if there was windblown debris underneath the roofing material. (See Exhibit 4, at Page 66, Lines 9-14).

**11.** Mr. Haar testified in his deposition that he never looked under the shingles to determine how many fasteners were used during installation or to see if there was evidence of seal strip transfer. (See Exhibit 4, at Page 44, Lines 11-25; Page 45, Lines 1-2; Page 68, Lines 12-17).

**12.** Mr. Haar testified in his deposition that he never examined whether the shingles on Plaintiffs' roof were unsealed. (See Exhibit 4, at Page 83, Lines 5-12).

**13.** Mr. Haar testified in his deposition that he did not observe any evidence of improper installation or manufacturing defect during his inspection. (See Exhibit 4, at Page 106, Lines 6-24).

**14.** Mr. Haar testified in his deposition that if wind blew up the Plaintiffs' shingles and pulled them through their fasteners, then that would constitute covered damage and direct physical loss under the policy. (See Exhibit 4, at Page 107, Lines 15-25; Page 108, 1-10).

**15.** Mr. Haar testified in his deposition that if wind blew up the Plaintiffs' shingles and created seal strip adhesive transfer, then that would constitute covered damage and direct physical loss under the policy. (See Exhibit 4, at Page 108, 11-18).

**16.** Mr. Haar testified in his deposition that the Plaintiffs' unsealed shingles would probably never reseal over time. (See Exhibit 4, at Page 118, 14-24).

**17.** After his inspection, Mr. Haar advised Plaintiffs that the damage was not enough "as far as AAA was concerned" and to withdraw their claim so as to not raise Plaintiffs' insurance "rates." Plaintiffs agrees to do so, as they were unsure of the extent of the damage. (See Exhibit 1, at

Page 74, Lines 20-25; Page 76, Lines 4-9; Page 78, Lines 19-23).

**18.** Plaintiffs reopened their claim with CSAA after their roof was inspected by Ryan Smith with High Choice Construction. Mr. Smith inspected the Plaintiffs roof and found serious wind damage which was overlooked by Mr. Haar, who admittedly did not conduct a thorough wind damage assessment.  (See Exhibit 1, at Page 80, Lines 10-19).

**19.** Ryan Smith replaced approximately 17 roofs in Plaintiffs' neighborhood as a result of the July 15, 2016 storm, including the Plaintiffs' next-door neighbor and five other homes on Plaintiffs' street. (See Exhibit 1, at Page 59, Lines 6-10; Page 60, Lines 1-8). (See also, Exhibit 2, at Page 14, Lines 20-25; Page 15, Lines 1-25; Page 16, Lines 1-21; Page 18, Lines 21-25; Page 19, Lines 1-19).

**20.** Plaintiffs requested a re-inspection from CSAA. CSAA inside adjuster Andrew Smith instructed Plaintiff to submit photographs of the wind damage. Plaintiffs did so. (See Exhibit 1, at Page 90, Lines 23-25; Page 91, Lines 1-12). (See also, Exhibit 2, at Page 17, Lines 7-13).

**21.** A re-inspection occurred on May 15, 2017. CSAA's assigned adjuster, Mickey Manzer, inspected the Plaintiffs' roof along with Plaintiffs' contractor Ryan Smith. Mr. Goins was also present for the re-inspection.

**22.** At this re-inspection, CSAA's assigned adjuster, Mickey Manzer, told Mr. Goins that his roof was totaled as a result of storm damage, but that he could not write it up for replacement because CSAA would not allow it. (See Exhibit 1, at Page 86, Lines 8-12; Page 93, Lines 17-25; Page 94, Lines 1-12). (See also, Exhibit 2, at Page 35, Lines 22-25; Page 36, Lines 1-24; Page 37, Lines 9-18).

**23.** At the start of the re-inspection, Mr. Manzer stepped out of his truck and told Mr. Goins and Ryan Smith that "if you're wanting us to buy this roof on wind then you're wasting our

time…because AAA doesn't buy roofs on wind" (Exhibit 1, at Page 93, Lines 22-25; Page 94, Lines 1-12). (See also, Exhibit 2, at Page 51, Lines 7-17).

**24.** Nonetheless, Mr. Manzer then inspected Plaintiffs roof with Ryan Smith. Mr. Manzer's re-inspection took only 15 minutes, at most. Mr. Smith showed Mr. Manzer the wind damage on the roof. (See Exhibit 2, at Page 37, Lines 19-25; Page 38, Lines 1-21).

**25.** After the re-inspection, Mr. Manzer got down off the roof and spoke with Kyle Goins and Ryan Smith. Mr. Manzer stated that he agreed the roof was totaled by wind and should be replaced. He stated that any carrier, other than CSAA, would pay to replace the roof, but that CSAA won't. (See Exhibit 1, at Page 96, Lines 8-25; Page 97, Lines 1-12; Page 99, Lines 1-25, Page 100, Lines 1-22). (See also, Exhibit 2, at Page 35, Lines 22-25; Page 36, Lines 1-24; Page 37, Lines 9-18).

**26.** Mr. Manzer stated that he had recently wrote up a wind damage claim to CSAA for replacement, but that it was rejected by CSAA and that his supervisor admonished him by asking "What the hell are you doing?" (See Exhibit 1, at Page 96, Lines 8-25; Page 97, Lines 1-12). (See also, Exhibit 2, at Page 39, Lines 9-24; Page 51, Lines 1-25; Page 52, Lines 1-2).

**27.** Mr. Manzer agreed that the Plaintiffs' roof was totaled and that the shingles were unsealed by wind. (See Exhibit 1, at Page 100, Lines 9-22).

**28.** Ryan Smith told Mr. Manzer that he had roofed many homes in Plaintiffs' neighborhood due to wind damage from the July 15, 2016 storm. Mr. Smith told Mr. Manzer about a roof claim in Plaintiffs' neighborhood which CSAA at first rejected, but ultimately paid to replace after having a re-inspection with a company adjuster, as opposed to an independent adjuster. Mr. Goins then requested an inspection with a CSAA adjuster. (See Exhibit 1, at Page 100, Lines 23-25; Page 101, Lines 1-25; Page 102, Lines 1-22). (See also, Exhibit 2, at Page 40, Lines 16-25; Page 41,

Lines 1-25; Page 42, Lines 1-2; Page 42, Lines 13-21).

**29.** Mr. Manzer told Mr. Goins that, as far as inspections go with AAA, you "get two shots" and that's it. (See Exhibit 1, at Page 102, Lines 11-22). (See also, Exhibit 2, at Page 40, Lines 16-25; Page 41, Lines 1-25; Page 42, Lines 1-2; Page 42, Lines 13-21).

**30.** Mr. Manzer also told Mr. Goins that, because any other carrier would pay to replace this roof, Mr. Goins could cancel his coverage with CSAA, getting coverage through a new carrier, and filing a new claim for the damage, despite the fact that the damage occurred during CSAA's coverage period. (See Exhibit 1, at Page 99, Line 25; Page 100, Lines 1-5). (See also, Exhibit 2, at Page 39, Lines 4-25; Page 40, Lines 1-15).

**31.** Mr. Manzer never told Mr. Goins that he observed installation issues on his roof or believed the roof was improperly installed. Mr. Manzer told Mr. Goins that the roof was totaled because of wind damage and that, if it were up to him, he would issue payment to replace the roof. (See Exhibit 1, at Page 108, Lines 22-25; Page 109, Lines 1-11).

**32.** Mickey Manzer authored a loss report after the re-inspection which stated that "No additional damage was found. The previous adjuster Shane Haar had found improper shingles installation issues throughout the roof. My findings were the same." (See Exhibit 3).

**33.** Mr. Haar admitted in his deposition that Mickey Manzer's statement in the loss report was untrue, as Mr. Haar did not find evidence of improper installation during his previous inspection. (See Exhibit 4, at Page 106, Lines 6-24).

**34.** Mr. Manzer's loss report also states that Plaintiffs' shingles "only had 3 nails installed and they were over driven. Although this installation error does make this roof more susceptible to shingles being blown off the roof, there were no missing shingles, no creased shingles and no torn shingles. Therefore no physical wind damage was found..." (See Exhibit 3).

**35.** After the re-inspection, Andrew Smith with CSAA sent Plaintiffs a denial letter stating that Mickey Manzer "determined that the damage was caused by overdriven fasteners into the shingles." (See Exhibit 10, Denial Letter, at CSAA_GOINS 0013-0014).

**36.** However, in his deposition, Andrew Smith testified that the photographs taken by Mickey Manzer at the re-inspection showed wind damage to the shingles and that it appeared the shingles had become unsealed recently due to a weather event. (See Exhibit 5, at Page 71, Lines 2-15; Page 72, Lines 3-5; Page 72, Lines 22-25; Page 73, Lines 1-10).

**37.** In this litigation, Plaintiffs have engaged renowned University of Oklahoma professor and structural engineer Dr. Christopher Ramseyer, Ph.D., P.E. Dr. Ramseyer has inspected the Goins' home and concluded that the roof was properly installed and permanently damaged by wind in the July 15, 2016 storm. (See Exhibit 6).

**38.** In his report, Dr. Ramseyer has identified and photographed wind damage to Plaintiffs' roof including nails pulling through the shingles, creasing of the roofing material, seal strip transfer, and zipper patterns, as referenced in CSAA's written guidelines for wind damage inspection (See Exhibits 6 and 8).

**39.** Plaintiffs have also engaged former CSAA National Catastrophe Team Lead and Corporate Representative, Sean C. Petronzi, to provide opinions regarding Defendant's handling of the Plaintiffs' claim. While at CSAA, part of Mr. Petronzi's duties were to review the claim files of cases in litigation, evaluate the claims handling decisions of subordinate adjusters, and make recommendations regarding the file. Mr. Petronzi evaluated this case the same way. (See Exhibit 11, Expert Report of Sean C. Petronzi).

**40.** The replacement cost of the storm damage to Plaintiffs' roofing system is $17,772.71. (See Exhibit 12, Expert Report of Kevin Hefley).

## ARGUMENT AND AUTHORITIES

## I: SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if the pleadings, affidavits, depositions, and other evidence show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. "[A] motion for summary judgment should be granted only when the moving party has established the absence of any genuine issue as to a material fact." Mustang Fuel Corp. v. Youngstown Sheet & Tube Co., 561 F.2d 202, 204 (10th Cir. 1977). The movant bears the initial burden of demonstrating the absence of a material fact requiring judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). A fact is material if it is essential to the proper disposition of the claim. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All inferences and conclusions to be drawn from the underlying facts are to be viewed in the light most favorable to the party opposing the motion. Northrip v. Montgomery Ward and Company, 529 P.2d 489 (Okl. 1974). As the Oklahoma Supreme Court has observed, "[S]ummary judgment is a lethal weapon and courts must be mindful of its aims and target and beware of overkill." Anson v. Erlanger Minerals and Metals, 702 P.2d 393, 398 (Okl.App. 1985) (quoting from Weaver v. Pryor Jeffersonian, 569 P.2d 967, 974 (Okl. 1985)). Summary judgment is inappropriate when it serves to defeat a litigant's right to have a jury resolve a factual issue bearing significantly on the outcome of the case. Martin v. Chapel, et al, 637 P.2d 81 (Okl. 1981).

As discussed below, Defendant cannot meet its burden and is not entitled to summary judgment on Plaintiffs' bad faith claim, as a reasonable jury, looking at all the evidence and testimony, could conclude that Defendant's investigation, evaluation, and denial of Plaintiffs' claim were unreasonable.

16

## II: **DEFENDANT IS NOT ENTITLED TO SUMMARY ADJUDICATION OF PLAINTIFFS' BAD FAITH CLAIM**

**A: Jury questions exist as to the reasonableness of Defendant's conduct during the investigation, evaluation, and denial of Plaintiffs' claim.**

Defendant's motion should be denied entirely as genuine issues of material fact exist surrounding Defendant's investigation, evaluation, and denial of Plaintiffs' claim. Oklahoma law is clear that "conflicting evidence as to reasonableness of conduct of the insurer is a jury question." Alsobrook v. National Travelers Life Insurance Company, 852 P.2d 768, 770 (Okl. 1992). The test of bad faith is a broad one where "the unreasonableness of the insurer's actions is the essence of the tort..." Alsobrook v. National Travelers Life Insurance Company, 852 P.2d 768, 770 (Okl. 1992), citing Conti v. Republic Underwriters Ins. Co., 782 P.2d 1357, 1360 (Okl. 1989). Further, "[t]he entire course of conduct between the parties is relevant in determining whether the duty of good faith has been breached." Id. at 1443.  It is well settled that an insurer has a legal duty to "deal fairly and act in good faith with its insured and that the violation of this duty gives rise to an action in tort for which consequential and, in a proper case, punitive damages may be sought." Christian v. American Home Assurance Company, 577 P.2d 899, 904 (Okl. 1977). When "[u]sing the standard for summary judgment of a bad faith claim, a plaintiff may defeat a motion for judgment as a matter of law by presenting enough evidence so that an 'insurer's conduct may be reasonably perceived as tortious." ' Vining v. Enterprise Financial Group, Inc., 148 F.3d 1206, 1213 (10th Cir. 1998). "The insured must present sufficient evidence from which a reasonable jury could conclude that the insurer did not have a reasonable good faith belief for withholding payment of the insured's claim." Timberlake Construction Co. v. U.S. Fidelity & Guaranty Co., 71 F.3d 335, 344 (10th Cir. 1995). Further, "conflicting evidence as to reasonableness of conduct of the insurer is a jury question." Alsobrook at 770 (Okl. 1992).

17

Under this standard, Plaintiffs have presented sufficient evidence that Defendant acted unreasonably and in bad faith by failing to conduct a reasonable inspection, investigation, and evaluation of Plaintiffs' wind damage claim. Defendant's denial of Plaintiffs claim was based on two inspections of Plaintiffs' property: the December 11th, 2016 Inspection conducted by Shane Haar and the May 15th, 2017 re-inspection conducted by Mickey Manzer. Each of these inspections, which are discussed in turn below, demonstrate genuine issues of material fact in dispute which a jury could conclude rise to the level of bad faith.

The first inspection by Mr. Haar did not even include a wind damage assessment of Plaintiffs' roof. CSAA's own written guidelines for wind damage inspection state that █ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████. (See Exhibit 8). Mr. Haar's claim note summarizing his inspection states that "[a]ll slopes were inspected for wind and hail damage." (See Exhibit 9). However, Mr. Haar admittedly did no wind damage inspection at all. He simply never examined any shingles for wind damage during his inspection. (See Exhibit 4, Page 44, Lines 2-25; Page 45, Lines 1-2; Page 66, Lines 2-14; Page 67, Lines 16-21; Page 68, Lines 12-25; Page 69, Lines 1-5; Page 72, Lines 8-25; Page 73, Lines 1-16; Page 83, Lines 5-10; Page 83, Line 25; Page 84, Lines 1-6; Page 97, Lines 8-11; Page 98, Lines 12-19). Specifically, Mr. Haar never inspected the underside of Plaintiffs' shingles to look for granular transfer, windblown debris, installation issues, or unsealing by wind. Mr. Haar testified in his deposition that he did not observe any overdriven or underdriven nails on the Plaintiffs' roof and that he never looked under the shingles to see if there was windblown debris underneath the roofing material, despite CSAA's own guidelines requiring him to do so. (See Exhibit 4, Page 66, Lines 9-14; Page 44, Lines 2-6). Likewise, Mr. Haar

testified in his deposition that he never looked under the shingles to determine how many fasteners were used during installation or to see if there was evidence of seal strip transfer. (See Exhibit 4, Page 44, Lines 11-25; Page 45, Lines 1-2; Page 68, Lines 12-17).Mr. Haar never examined whether the shingles on Plaintiffs' roof were unsealed. (See Exhibit 4, Page 83, Lines 5-12). Mr. Haar never looked for these indications of wind damage, even though he acknowledged in his deposition that (1) they amount to direct physical loss and (2) it is unreasonable for an adjuster to not identify and issue payment for direct physical loss resulting from a covered peril such as wind. (See Exhibit 4, at Page 45, Lines 22-25; Page 46, Lines 1-9; Page 107, Lines 15-25; Page 108, 1-10).

Mr. Haar unreasonably failed to conduct any basic wind damage assessment of the Plaintiffs' roof, even though the claim was submitted for wind damage and his own inspection revealed collateral wind damages, including gutters, a backyard gate, and a roof exhaust which had been damaged by wind. (See Exhibit 13, Haar Inspection Findings, at CSAA_GOINS 0076-0077, 0082). At best, Mr. Haar's inspection of Plaintiffs' roof was sloppy and unreasonable, as he conducted essentially no investigation of potential wind damage. Regardless, when examining the entire course of conduct between the parties, including Mr. Manzer's inspection discussed below, CSAA's conduct "may be reasonably perceived as tortious", thus Defendant is not entitled to summary judgment. Vining v. Enterprise Financial Group, Inc., 148 F.3d 1206, 1213 (10th Cir. 1998).

At the May 15, 2017 re-inspection, CSAA's assigned adjuster, Mickey Manzer, told Plaintiff Kyle Goins and his roofing contractor, Ryan Smith, that Smith that "if you're wanting us to buy this roof on wind then you're wasting our time…because AAA doesn't buy roofs on wind" (Exhibit 1, Page 93, Lines 22-25; Page 94, Lines 1-12). (See also, Exhibit 2, Page 51,

Lines 7-17). Mr. Manzer made this statement prior to even inspecting the Plaintiffs' roof. Mr. Manzer, an independent adjuster, also told Mr. Goins and Mr. Smith that he had recently attempted to write up a wind damage claim to CSAA for replacement, but that it was rejected by CSAA and that his supervisor admonished him by asking "What the hell are you doing?" (See Exhibit 1, Page 96, Lines 8-25; Page 97, Lines 1-12). (See also, Exhibit 2, Page 39, Lines 9-24; Page 51, Lines 1-25; Page 52, Lines 1-2). After Mr. Manzer inspected the Plaintiffs' roof, he told Mr. Goins and Mr. Smith that he agreed the roof was totaled by wind and should be replaced. Mr. Manzer stated that any carrier, other than CSAA, would pay to replace the roof, but that CSAA won't. (See Exhibit 1, Page 96, Lines 8-25; Page 97, Lines 1-12; Page 99, Lines 1-25, Page 100, Lines 1-22). (See also, Exhibit 2, Page 35, Lines 22-25; Page 36, Lines 1-24; Page 37, Lines 9-18). Mr. Manzer stated that the Plaintiffs' roof was totaled and that the shingles were unsealed by wind. (See Exhibit 1, Page 100, Lines 9-22). Mr. Manzer never told Mr. Goins that he observed installation issues on his roof or believed the roof was improperly installed. Mr. Manzer told Mr. Goins that the roof was totaled because of wind damage and that, if it were up to him, he would issue payment to replace the roof. (See Exhibit 1, Page 108, Lines 22-25; Page 109, Lines 1-11). Mr. Manzer then recommended to Plaintiff that, because any other insurance carrier would pay to replace his roof due to the wind damage, Plaintiff should cancel his coverage with CSAA, get coverage through a new carrier, and file a new claim for the damage, despite the fact that the damage occurred during CSAA's coverage period, because CSAA will never pay for it. (See Exhibit 1, Page 99, Line 25; Page 100, Lines 1-5). (See also, Exhibit 2, Page 39, Lines 4-25; Page 40, Lines 1-15).

    To overcome a summary judgment challenge against a bad faith claim, the "insured must present sufficient evidence from which a reasonable jury could conclude that the insurer did not

have a reasonable good faith belief for withholding payment of the insured's claim." <u>Timberlake Construction Co. v. U.S. Fidelity & Guaranty Co.</u>, 71 F.3d 335, 344 (10th Cir. 1995). No reasonable juror could view this evidence and reach any conclusion other than that Defendant acted unreasonably in the handling of Plaintiffs' claim. Mr. Manzer's statements at the re-inspection have been discussed at length in the depositions of Plaintiff Kyle Goins and have been corroborated in the deposition of Ryan Smith of High Choice Construction, who was present for the conversations at the re-inspection. In this litigation, Mr. Manzer has denied many of these conversations. This clearly demonstrates that genuine issues of material fact are in dispute regarding what happened at the re-inspection which, according to Mr. Haar's own testimony, is the only time a CSAA representative ever conducted a wind damage assessment of Plaintiffs' roof. Further, Oklahoma law is clear that "conflicting evidence as to reasonableness of conduct of the insurer is a jury question." <u>Alsobrook</u> at 770 (Okl. 1992). Defendant's Motion for Summary judgement should be denied, as genuine issues of material fact exist and a jury must decide (1) what really happened at the May 15, 2017 re-inspection, (2) who's telling the truth about what transpired that day, and (3) whether Defendant's conduct was reasonable under the circumstances. Drawing all inferences and conclusions from these disputed facts and viewing them in the light most favorable to Plaintiffs, it is clear that summary judgment is not proper as to Plaintiffs' bad faith claim and Defendant's motion should be denied.

Further, genuine issues of material fact are in dispute regarding the reasonableness of Defendant's refusal to allow another re-inspection of Plaintiffs' home with a CSAA adjuster. After Mickey Manzer told Plaintiff that, although he agrees the roof is totaled by wind but that CSAA will not pay for it, Mr. Goins requested another inspection with a CSAA adjuster. (See Exhibit 1, Page 100, Lines 23-25; Page 101, Lines 1-25; Page 102, Lines 1-22). (See also,

Exhibit 2, Page 40, Lines 16-25; Page 41, Lines 1-25; Page 42, Lines 1-2; Page 42, Lines 13-21).

Mr. Manzer then told Mr. Goins that, as far as inspections go with AAA, you "get two shots" and

that's it. (See Exhibit 1, Page 102, Lines 11-22). (See also, Exhibit 2, Page 40, Lines 16-25; Page

41, Lines 1-25; Page 42, Lines 1-2; Page 42, Lines 13-21). CSAA's refusal to re-inspect the

Plaintiffs' home was not reasonable under the circumstances. It was undisputed by Mr. Manzer

that the roof was totaled by wind and that a CSAA inside adjuster had more "power" to adjust

claims. Indeed, Mr. Smith testified that he was involved in another roof claim in Plaintiffs'

neighborhood which CSAA at first rejected, but ultimately paid to replace after having a re-

inspection with a company adjuster, as opposed to an independent adjuster. Despite this, CSAA

refused at allow another re-inspection arbitrarily, stating that you "get two shots" and that's it.

Had CSAA allowed for another re-inspection, it may have led to payment of the claim. A

reasonable juror could certainly view this as unreasonable. Further, this evidence involves

disputed facts and may be reasonably perceived by a jury as tortuous. Defendant's motion should

be denied.

**B: Defendant's claim that a "legitimate dispute" exists is not supported by the evidence.**

In its Motion for Summary Judgment, Defendant makes the argument that this case

involves a mere dispute as to causation. In other words, Defendant argues that Plaintiffs' shingles

are unsealed and CSAA believes it is an installation defect, while Plaintiffs say it is wind.

Defendant's argument is misleading, ignores disputed facts in the record, and relies heavily upon

the expert testimony of Michael Berryman, who Defendant did not rely upon or retain during the

claim process at the time it was called upon to perform under Plaintiffs' insurance policy. First, it

should be noted that the evidence cited and discussed in Part A above is, in and of itself,

dispositive on the issue, as Oklahoma law clearly states that while an insurer may not be liable

for bad faith where a bona fide disagreement or dispute arises, that dispute or disagreement must be reasonable and a carrier must "deal fairly and act in good faith with its insured" <u>Christian v. American Home Assurance Company</u>, 577 P.2d 899, 904 (Okl. 1977). As discussed in in Part A above, Defendant's conduct during the May 15, 2017 re-inspection, as well as viewing the entire course of conduct between the parties, clearly demonstrates that jury questions exist as to the reasonableness of Defendant's claim handling.

Regardless, Defendant's "legitimate dispute as to causation" argument is simply not supported by the record. CSAA cannot even demonstrate the absence of any material fact as to <u>its own position</u> on the installation of Plaintiffs' roof during the claim process, let alone establish a "reasonable disagreement" between the parties. For example, while Mr. Manzer's loss report notes "improper shingles installation issues", he never told Mr. Goins that he observed installation issues on his roof or believed the roof was improperly installed. Instead, Mr. Manzer told Mr. Goins that the roof was totaled because of wind damage and that, if it were up to him, he would issue payment to replace the roof. (See Exhibit 3, Loss Report, at CSAA_GOINS 0177). (See also, Exhibit 1, Deposition of Kyle Goins, Page 108, Lines 22-25; Page 109, Lines 1-11). Further, Mr. Manzer's loss report identifying "improper installation" states that it is consistent with Mr. Haar's findings of improper installation, which Mr. Haar admitted in his deposition he never made. To the contrary, Mr. Haar testified in his deposition that he did not observe any evidence of improper installation or manufacturing defect during his inspection. (See Exhibit 4, Page 106, Lines 6-24). Further, CSAA's adjuster Andrew Smith, who sent Plaintiffs a denial letter stating that CSAA "determined that the damage was caused by overdriven fasteners into the shingles" later testified that that the photographs taken by Mickey Manzer at the re-inspection showed that the shingles had become unsealed recently due to a

weather event. (See Exhibit 5, Deposition of Andrew Smith, Page 71, Lines 2-15; Page 72, Lines 3-5; Page 72, Lines 22-25; Page 73, Lines 1-10). The record is rife with evidence of material facts in dispute regarding Defendant's defense of "reasonable disagreement." It is not even clear in the record that Defendant believed that Plaintiffs roof was improperly installed. Defendant's Motion should be denied, as a "legitimate dispute" defense is not supported by the record and a jury should properly decide these issues, including whether or not Defendant's "disagreement", if you could even call it that, was reasonable under the circumstances.

### III: DEFENDANT'S ARGUMENTS WITH RESPECT TO PUNITIVE DAMAGES ARE PREMATURE. NONETHELESS, THE EVIDENCE IN THIS CASE WARRANTS A PUNITIVE DAMAGE INSTRUCTION.

Defendant's final argument is that the record does not contain any evidence of acts which were intentionally wrongful, deceitful, or dishonest, and thus Defendant asks this Court to dispose of Plaintiffs' claim for punitive damages.  Defendant's arguments, while premature and more proper for consideration at the time the jury is instructed on these issues, are nonetheless without merit. Oklahoma courts routinely allow punitive damages to be assessed by the jury in bad faith claims. See Capstick v Allstate Ins. Co. (1993, CA10 Okla) 998 F2d 810; See also, Hatfield v. Liberty Mut. Ins. Co., 98 Fed. Appx. 789 (10th Cir. 2004).

Malice is defined "a wrongful act done intentionally, without just cause or excuse." Schonwald v. Ragains, 1912 OK 210, 32 Okla. 223, 122 P. 203, 203; See also, Tuffy's, Inc. v. City of Oklahoma City, 2009 OK 4, ¶ 14, 212 P.3d 1158, 1165( Malice is defined as an unreasonable and wrongful act done intentionally, without just cause or excuse). Further, Oklahoma law provides that malice in the law may exist without personal hatred, ill will, or spite. Del State Bank v. Salmon, 1976 OK 42, 548 P.2d 1024, 1026. The record clearly demonstrates that there is sufficient evidence to show that Defendant acted unreasonably and

wrongfully, without just cause of excuse. After inspecting Plaintiffs' roof, CSAA's adjuster, Mickey Manzer, stated that he agreed that Plaintiffs' roof was damaged by wind and needed to be replaced as a result. He stated he agreed with Plaintiffs' roofing contractor about the damage, but could not write it up for replacement because CSAA does not pay for wind damage. CSAA took this position despite the fact that its own policy provides coverage for direct physical loss caused by wind. Further, Mickey Manzer advised Plaintiff to get a new insurer, wait for another storm, and then submit a claim to the new carrier for damages that CSAA owes for and which occurred during its coverage period. This is plainly evidence of fraudulent, malicious, and deceitful conduct on part of CSAA and the jury should receive an instruction on punitive damages.

<u>**CONCLUSION**</u>

Plaintiffs respectfully request that this Court deny Defendant's Motion for Summary Judgment in its entirety as genuine issues of material fact exist which must be decided by a jury, thereby precluding the issuance of summary judgment. Plaintiffs also seek any additional relief that this Court deems just and proper.


Respectfully submitted,

/s Matthew M. McGrew
Matthew M. McGrew, OBA # 32065
McGrew, McGrew & Associates, P.C.
400 N. Walker, Suite 115
Oklahoma City, Oklahoma 73102
Telephone: (405) 235-9909
Fax: (405) 235-9929
E-mail Address: mcgrewslaw@yahoo.com
**Counsel for Plaintiffs**

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of May, 2018, I electronically transmitted the foregoing document, Plaintiffs' (redacted) Opposition to MSJ to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Gerard Pignato
Jace T. White

Counsel for Defendant

_**S/ Matthew M. McGrew**_
Matthew M. McGrew