EXHIBIT 1

1           IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF OKLAHOMA
2               CASE NO.:  17-CV-347-JHP-MJX

3

4   1.   KYLE GOINS,                 )
    2.   KARI GOINS,                 )
5                                    )
              Plaintiffs,            )
6                                    )
    vs.                              )
7                                    )
    1.   CSAA FIRE & CASUALTY        )
8   INSURANCE COMPANY, a foreign     )
    for-profit insurance            )
9   corporation,                     )
                                     )
10            Defendant.             )

11

12

13            DEPOSITION OF KYLE GOINS

14        TAKEN ON BEHALF OF THE DEFENDANT

15            IN TULSA, OKLAHOMA

16            ON JANUARY 9, 2018

17

18     REPORTED BY:  JOHN Q. MARTIN, II, CSR #1940

19

20

21

22

23

24

25



1    Q.   Is that a yes?

2    A.   Yes.

3    Q.   And you don't recall who you spoke with, is

4    that correct?

5    A.   Correct.

6    Q.   T-Town just happened to be the one that called

7    you back?

8    A.   Yes, sir.

9    Q.   Okay.  Now, you said a storm event came

10   through your neighborhood.  When did that storm event

11   occur?

12   A.   July.

13   Q.   So, you have a storm event, to the best of

14   your recollection, that occurred in July of 2016, is

15   that correct?

16   A.   Yes, sir.

17   Q.   And in December you have somebody come look at

18   your roof?

19   A.   I apologize.  Brian had come out in August and

20   then in December is when Brian and AAA were on the

21   roof to inspect.  So, that was an inspection.  That's

22   what I thought you meant.

23   Q.   Okay.  So, to make sure that I've got your

24   testimony accurately, when I'm saying inspection, I'm

25   not just talking about insurance inspection, I'm



1     Q.   And what gave you this belief that it had been

2   damaged by wind?

3     A.   Because of the event.

4     Q.   Was there anything physically to the roof that

5   caused you to believe that your roof had been

6   damaged?

7     A.   Yes.

8     Q.   And what exactly was that?

9     A.   Missing shingles.

10     Q.   You had missing shingles on your roof sometime

11   after July of 2016?

12     A.   Yes, sir.

13     Q.   Sorry, let me finish.   Sometime between July

14   2016 and before you made your claim with CSAA, there

15   were shingles on your roof missing?

16     A.   Yes.

17     Q.   Did you replace those shingles?

18     A.   Yes.

19     Q.   And before you made the claim with CSAA did

20   you replace those shingles?

21     A.   No.

22         MR. McGREW:   And let's be clear on the record,

23   now you're saying, did you replace them as opposed to

24   did you have them replaced.

25         MR. ROONEY:   Don't worry, Mike, I'll make sure



 1   I get that cleared up.

 2       Q.   (BY MR. ROONEY)   So, in --

 3       A.   Could you repeat that again.   Because the only

 4   reason the shingles were replaced was after the CSAA

 5   inspection in December.   They were replaced after

 6   that.

 7       Q.   We'll start back between July -- after this

 8   storm event in July you said that you believe there

 9   were some shingles missing on your roof, is that

10   correct?

11       A.   Correct.

12       Q.   And before you made your claim with CSAA did

13   you, whether it be you personally or somebody you

14   hired, repair or replace those missing shingles?

15       A.   No.

16       Q.   And you spoke with Brian about helping you

17   with this roof.   Between July of 2016 and December,

18   when you made your claim with CSAA, had there been

19   any changes that you made to the roof, whether you

20   had somebody go up and look at it, inspecting it,

21   repair it, did anything change since the time Brian

22   looked at it and the time you made your claim with

23   CSAA?

24       A.   No.

25       Q.   Do you recall where those missing shingles



1    were located?

2       A.   Yes, sir, on the front north side of the home,

3    on the rake of the roof.

4       Q.   When you say the rake of the roof what are you

5    talking about?

6       A.   There is a pitch on the front of my home above

7    the garage.

8       Q.   Are you talking about the very top of the

9    roof, at the peek?

10      A.   The peek, it was right down here on this side

11   of it, all the shingles were blown off.

12      Q.   Okay.  So, if I'm looking at your garage is it

13   the right side or the left side of the --

14      A.   Your right side.

15      Q.   And is it in the field or is it on the ridge

16   that the shingles were missing?

17           MR. McGREW:  He said the rake.  That's the

18   edge, it's the outer edge.  You're using the wrong

19   term.

20           MR. ROONEY:  Thank you.  It's been a long

21   morning for me already.  Please forgive me, guys.

22                   (Off the record)

23      Q.   (BY MR. ROONEY)  Mr. Goins, we're back on the

24   record.  You understand that your testimony is still

25   under oath?



1      A.   Yes, sir.

2      Q.   Since our short break, is there any portion

3   of the testimony you've given today that you feel you

4   need to correct or change?

5           MR. McGREW:  No.

6           THE WITNESS:  No, sir.

7           MR. ROONEY:  Mike, are you instructing the

8   witness how to answer that question?

9           MR. McGREW:  No.  It's more of a lashing at

10  you for that question.  But go ahead.  Sorry.

11     Q.   (BY MR. ROONEY)  Now, when we took our break

12  you were telling me that you noticed after this July

13  windstorm that there were some shingles missing on

14  the rake of the roof near your garage, is that

15  correct?

16     A.   Correct.

17     Q.   When did you first notice those shingles

18  missing?

19     A.   Within a day or two of the storm.

20     Q.   Do you recall the exact date of the storm?

21     A.   I'm going to say July 14th or 15th.  I can't

22  say exactly.

23     Q.   I'm not trying to trick you, I'm just trying

24  to get what you recall.  If you're guessing or

25  estimating a date or time just let me know it's an



1    missing shingles.  Was there any other damage that you

2    were aware of with respect to your roof when you made

3    the claim in December?

4        A.   Other than the shingles being scattered

5    throughout my yard and the missing shingles, that was

6    the extent that I was aware of.

7        Q.   Okay.  Are these the same five shingles that

8    you saw missing?

9        A.   No, sir.

10       Q.   So, there were additional shingles that you

11   saw in your yard?

12       A.   Yes, sir.

13       Q.   And you believe those shingles came from your

14   roof?

15       A.   Absolutely.

16       Q.   And do you know where on your roof these

17   shingles came from, the ones in your yard?

18       A.   No, sir.

19       Q.   So, it's your testimony that in addition to

20   the five shingles that you noticed missing on the

21   rake there were other shingles in your yard that you

22   believe came from your roof somewhere, correct?

23       A.   Correct.

24       Q.   But you don't know where on your roof?

25       A.   Correct.



1    Q.  Or Brian's employer?

2    A.  Yes, Brian.

3    Q.  Do you know, did you pay him directly or was

4    it through whoever he was employed by?

5    A.  I paid him directly.

6    Q.  Okay.  So, what caused you to turn in your

7    claim to CSAA, why did you decide to turn in a claim?

8    A.  Because of the storm event that happened in

9    July we had noticed that everybody in the neighborhood

10   had damage and was getting their roof repaired.

11   Q.  Now, when you say everybody in the

12   neighborhood was getting their roof repaired, do you

13   have the names of any individuals that got their roof

14   repaired after this July storm?

15   A.  Yes, I do.

16   Q.  Okay.  Who are those individuals?

17   A.  Candice and Aaron McCaffrey.

18   Q.  Okay.

19   A.  As far as any other names in the neighborhood

20   I couldn't give you any more.

21   Q.  And where does Mr. and Mrs. McCaffrey live in

22   relation to you, are they neighbors, across the

23   street?

24   A.  They lived directly to my west, but they have

25   moved since.



1    Q.   They were the house right next door to you to

2    the west?

3    A.   Yes.

4    Q.   And do you know, those repairs, do you know

5    why they were made?

6    A.   To their home?

7    Q.   Yes.

8    A.   Due to the July storm.

9    Q.   Have you discussed the repairs with them?

10   A.   No.

11   Q.   Okay.  So, how do you know the repairs that

12   were being performed to their roof was related to the

13   July storm?

14   A.   Because of Ryan, the guy that was performing

15   the repair.

16   Q.   Okay.  Ryan, and just so I understand, when

17   you're saying Ryan you're talking about the second

18   roofer you spoke with, is that correct?

19   A.   Correct.

20   Q.   So, Ryan told you that your neighbors had

21   their roof repaired as a result of the July storm?

22   A.   Correct.  And that he could see damage from

23   their roof and could see the damage on mine.

24   Q.   When did you speak with Ryan regarding

25   McCaffrey's roof?



1  to make a claim?

2      A.  I believe so.

3      Q.  And when you decided to make a claim, was that

4  at the recommendation of Brian or is this somebody

5  else or is this just a decision you and your wife came

6  to on your own?

7      A.  That was a decision my wife and I came to.

8      Q.  Now, what damages did you observe as a result

9  of the windstorm that you are claiming to CSAA in

10  December?

11     A.  That my gates were blown off, my gutter on the

12  east side was dislodged from the home and I had

13  missing shingles and several shingles scattered

14  throughout my yard.

15     Q.  So, in July you noticed -- sorry, back up.

16         When did you notice the gutter was dislodged?

17     A.  The day of.

18     Q.  Okay.  And when you said gates blown off, do

19  you have multiple gates on your property?

20     A.  Two.

21     Q.  And were both of them blown off?

22     A.  Yes.

23     Q.  And did you, prior to presenting your claim to

24  CSAA, repair those gates?

25     A.  No.



1    believe she met Shane.

2        Q.   Okay.  Were your children home?

3        A.   I believe they were.

4        Q.   Same thing, inside the house?

5        A.   Yes.

6        Q.   After Mr. Haar got off the roof did he do any

7    further inspection around the property?

8        A.   No.

9        Q.   So, the roof was the last thing that he

10   inspected?

11       A.   Yes.

12       Q.   Did you have any conversations with Mr. Haar

13   after he completed his inspection?

14       A.   Yes.

15       Q.   Okay.  What do you recall about -- let me back

16   up real quick.  Was Brian present during that

17   conversation?

18       A.   Yes.

19       Q.   Okay.  And do you recall that conversation?

20       A.   Yes.  Shane informed me that, although my roof

21   was damaged, it wasn't enough as far as AAA was

22   concerned to file -- to pursue this claim.

23            So, he suggested that it would be in my best

24   interest to keep my rates from going up to withdraw

25   the claim and pay for it out of my pocket.



1    A.   It was in my best interest to withdraw.

2    Q.   I'm sorry, I'm going to finish my question.

3  Again, I know you think you know where I was going.

4         He could have given you the option, but to

5  your recollection it was his suggestion that you

6  withdraw the claim?

7    A.   Yes.

8    Q.   Now, did you decide to withdraw your claim?

9    A.   Yes.

10   Q.   Now, when you made that decision did you make

11 it there at that same inspection?

12   A.   I don't believe so.

13   Q.   So, you contacted him or he contacted you

14 later and you told him you wanted to withdraw the

15 claim?

16   A.   I believe I contacted Andrew Smith.

17   Q.   Andrew Smith you think is the one you think

18 you talked to and told him you wanted to withdraw your

19 claim?

20   A.   Correct.

21   Q.   Now, prior to making that decision did you

22 have any conversations with Brian regarding whether

23 you should pursue your claim or whether you should

24 withdraw it?

25   A.   No.



1    Q.   Did Brian give you any input on his opinion

2  regarding whether you should pursue the claim or

3  withdraw it?

4    A.   No.   He left that up to me.   He did agree that

5  the roof was damaged, but it was totally up to me how

6  far I wanted to pursue it.

7    Q.   Just so I understand what you're saying, Brian

8  agreed the roof was damaged?

9    A.   Uh-huh.

10    Q.   But he told you it was your call, whatever you

11  wanted to do?

12    A.   Correct.

13    Q.   Did Brian tell you the extent of damage he

14  observed when he was inspecting the roof for the first

15  time in December?

16    A.   No.

17    Q.   I'm sorry.   While he was walking the roof for

18  the first time in December?

19    A.   No.

20    Q.   Did he tell you that he agreed with Mr. Haar's

21  assessment regarding the extent of damage to the roof?

22    A.   No, he didn't tell me that he agreed with

23  Shane.   He said the roof was damaged.   That was the

24  extent of it as far as Brian and I's conversation

25  about it.



1    Q.  So, Brian gave you no opinions regarding what

2   he believed the extent of damage, regarding how you

3   should proceed with your claim, he just said there's

4   damage, do what you want?

5    A.  Absolutely.  He said, it's your call.  The

6   roof is damaged, but he didn't know my circumstances,

7   so he left that option up to me.

8    Q.  Did you ask him what he believed the extent of

9   damage to your roof was?

10    A.  To his opinion, the roof needed to be replaced

11   is what he told me.

12    Q.  Brian told you this?

13    A.  Yes.

14    Q.  Not Ryan?

15    A.  Brian.

16    Q.  Did he tell you this before or after you made

17   the decision to withdraw your claim?

18    A.  Before.

19    Q.  So, if Brian told you that the roof in his

20   opinion was a total loss what made you decide to go

21   ahead and withdraw your claim?

22    A.  Well, Mr. Haar mentioned something about my

23   rates could possibly go up.

24    Q.  And if Mr. Haar testified that he did not make

25   any comments regarding that would he be lying?



1     A.  Correct.

2     Q.  Did he explain to you why he believed the roof

3     was totalled?

4     A.  No.

5     Q.  Okay.  Now, after you withdrew your claim it's

6     my understanding that you contacted CSAA and told

7     them you wanted to resubmit the claim, is that

8     correct, or reopen the claim?

9     A.  Correct.

10    Q.  What caused you to reopen the claim?

11    A.  Ryan Smith was doing a lot of repairs in that

12    neighborhood and asked, because he could see some

13    damage from the ground, he asked if it was okay if he

14    got up there to take a look.  And I said sure.  And

15    then when he comes down he says, this roof is one of

16    the worst roofs in this neighborhood.  And he's done

17    thirteen to fourteen roofs at that time.  And he

18    suggested that I reopen this claim because there's

19    serious damage.

20    Q.  And when did Ryan ask if he could -- what

21    month did he first approach you?

22    A.  Within the early part of 2017.

23    Q.  And did he tell you why he was out there

24    making repairs to other homeowners' roofs in the

25    neighborhood?



1    question.

2         Other than your attorney, has anybody told you

3    that your roof is totalled as a result of storm

4    damage?

5         A.   Yes.

6         Q.   Who?

7         A.   Mickey Manzer.

8         Q.   Mickey Manzer told you that your roof is

9    totalled as a result of storm damage?

10        A.   Yes.

11        Q.   Who is Mickey Manzer?

12        A.   He's a AAA inspector.

13        Q.   And we'll come back to your conversations with

14   Mickey shortly, sorry, Mr. Manzer.

15        Has anybody other than Brian, Ryan and

16   Mr. Manzer told you your roof was a total loss as a

17   result of storm damage?

18        MR. McGREW:   And again, that excludes any

19   conversations with me or my representatives or my

20   son.

21        THE WITNESS:   Okay.   To answer that question

22   then, no.

23        Q.   (BY MR. ROONEY)   Okay.   So, after Ryan Smith --

24   just to simplify this, so we don't have confusion,

25   Mr. Smith.



1    Q.   You just took him at his word, right?

2    A.   Correct.

3    Q.   And did CSAA say you couldn't have a second

4    inspection?

5    A.   They said that we would have to provide more

6    photos.

7    Q.   So, you told him by law you're entitled to an

8    inspection and they said give us photos, is that

9    correct?

10   A.   More or less, yes.

11   Q.   Now, do you know what the law requires in

12   order -- this law you're claiming, do you know what it

13   requires for you to be entitled to a second

14   inspection?

15   A.   No.

16        MR. McGREW:   Counsel, for the record, we're

17   not claiming that it's a law, regardless of what

18   people may think.   You and I know we're not claiming

19   it's a law.

20        MR. ROONEY:   Just following up on his

21   testimony.   I'm going to ask that you object to the

22   form, nothing else.   That was his testimony.

23   Q.   (BY MR. ROONEY)   So, CSAA said, send us some

24   pictures and we'll do a re-inspection, is that

25   correct?



1      A.  They said to submit some photos and they would

2  determine if it was worth sending another inspector

3  out.

4      Q.  And did you submit those photos?

5      A.  Yes.

6      Q.  Okay.  And did you submit the photos in a

7  relatively short period of time after your

8  conversation with CSAA?

9      A.  I believe it was, yes.

10      Q.  And after you submitted those photos did CSAA

11  agree to perform an inspection?

12      A.  Yes.

13      Q.  And did somebody contact you to schedule that

14  inspection?

15      A.  Yes.

16      Q.  Do you recall who that was?

17      A.  No.

18      Q.  Were you the one that set up the inspection or

19  did Ryan set up the inspection?

20      A.  I did.

21      Q.  And I'm referring to the second inspection.

22  Sorry.  I just want to make sure we're clear.  Does

23  that change your answer any?

24      A.  No.

25      Q.  Okay.  You do not recall who contacted you to



1   Q.  Was anybody else present during his

2   inspection?

3   A.  Ryan.

4   Q.  And Mr. Smith, right?

5   A.  Yes.

6   Q.  So, it was you, Mr. Smith and Mr. Manzer,

7   correct?

8   A.  Correct.

9   Q.  Was your wife present?

10  A.  No.

11  Q.  Were your children present?

12  A.  No.

13  Q.  Do you recall who arrived first?

14  A.  No, because I was the last one to arrive.

15  Q.  Okay.  So, you came home for the inspection?

16  A.  Yes.

17  Q.  When you arrived were Mr. Manzer and Mr. Smith

18  speaking?

19  A.  No.

20  Q.  To your knowledge, had they introduced

21  themselves to each other?

22  A.  No.  When I arrived Mr. Manzer stepped out and

23  said to Ryan and I that --

24      MR. McGREW:  Stepped out from where?

25      THE WITNESS:  I'm sorry.  Stepped out from his



1    truck because they were parked right there.  He steps

2    out and we introduce ourselves.  And Mickey's words

3    to us was, if you're wanting us to buy this roof on

4    wind then you're wasting our time because we've

5    already -- because AAA doesn't buy roofs on wind, is

6    what he told us.  But he would be more than happy to

7    get on the roof if we'd like him to.

8        Q.   (BY MR. ROONEY)  It's your testimony that

9    Mr. Manzer, as he got out of his car and introduced

10   himself he told you that CSAA doesn't buy roofs on

11   wind and you're just wasting your time?

12       A.   Correct.

13       Q.   Did he get up on the roof?

14       A.   Yes.

15       Q.   Did Mr. Smith get on the roof with him?

16       A.   Yes.

17       Q.   And did Mr. Smith and Mr. Manzer walk the

18   entire roof?

19       A.   Yes.

20       Q.   By that time you had already patched or

21   repaired the five missing shingles, right?

22       A.   Yes.

23       Q.   Had you made any other repairs other than the

24   flashing at that time?

25       A.   No.



1     A.   No, not that I'm aware of.

2     Q.   Did you follow them around, while you were on

3  the ground did you follow what they were doing?

4     A.   No, sir.

5     Q.   Where were you during the inspection?

6     A.   I was in the front yard on the north side of

7  the home.

8     Q.   Now, after Mr. Manzer finished inspecting the

9  roof, after he got down what happened?

10    A.   Well, he comes down, I asked him what he

11 thought.  He said, I agree with you too, the roof is

12 bad, it's totalled, it should be replaced.  He said,

13 any other carrier would replace this roof, but not

14 AAA.  And that he had this same situation come up a

15 week prior and it was rejected.  And that a

16 supervisor, when he did send the information his

17 supervisor asked him, what the hell are you doing.

18    Q.   Okay.  Now, you just put air quotes around

19 "what the hell are you doing."

20         MR. McGREW:  Well, you need to make sure that

21 he's finished with everything he said.  You started

22 asking him another question.

23    Q.   (BY MR. ROONEY)  I'm sorry, were you finished

24 with your answer?

25    A.   Yes.  As far as my air quotes, that is what



1  Mickey Manzer said to me.  He said that's what his
2  supervisor had informed him, that you know this is
3  going to be rejected, so you're basically wasting
4  your time.
5        And at that point Ryan pointed down the
6  street.  He had already done thirteen to fourteen
7  homes in that neighborhood.  And there was a
8  gentleman that had AAA as well that was rejected the
9  first time.  And until they had sent a AAA field
10 adjustor out to look at the roof the second time the
11 roof was bought within ten minutes, is what Ryan had
12 told Mickey and I.
13       MR. ROONEY:  Move to strike because there was
14 no question on the table at that point in time.
15       MR. McGREW:  You asked him what all was said
16 and now you're striking --
17       MR. ROONEY:  I asked him what Mr. Manzer told
18 him.
19       MR. McGREW:  I think you asked what happened
20 when they got off the ladder.
21       THE WITNESS:  The conversation when they came
22 down.
23       MR. McGREW:  Let's take a break and I'm going
24 to read the question.
25                  (Off the record)



1    Q.  What do you recall happened after the two got

2  off the roof?

3    A.  Okay.  Once the two come down off the roof I

4  said, what do you guys think?  Mickey says, I agree,

5  the roof is totalled, the shingles are all unsealed,

6  but AAA is not going to cover this.

7       That's when he informed me of his experience

8  from a week ago when he had the same circumstance and

9  it was rejected.

10    Q.  Not to interrupt you, real quick, though, when

11  you say "he" who are you talking about?

12    A.  I'm talking about Mickey Manzer.

13    Q.  Thank you.

14    A.  He said that that same situation had occurred

15  a week ago and that that was rejected.  And that any

16  other carrier would buy this roof, but AAA will not

17  based on the findings.

18       Then Ryan, Mr. Smith, brought up that he had

19  done at least thirteen to fourteen homes in the

20  neighborhood and pointed to one specifically down the

21  street that was covered by AAA and that was rejected

22  the first time until AAA sent out a field adjustor on

23  the second time and the roof was bought within ten

24  minutes, per Ryan.

25       Ryan goes off to his truck.  Mickey Manzer



1    turns to me and says, you didn't hear this from me,

2    but I've heard of people canceling their coverage,

3    hiring a new carrier, claiming the roof and getting

4    the roof fixed.  And I was shocked.  I was surprised

5    to hear that.

6        Q.  Are you done?

7        A.  Yes.

8        Q.  I don't want to interrupt you.

9            So, Mr. Manzer told you that he saw lots of

10   unsealed shingles, is that correct?

11       A.  Correct.

12       Q.  Did he tell you what he believed the cause of

13   those shingles becoming unsealed was?

14       A.  Due to the storm damage and wind and the event

15   that happened in July.

16       Q.  And Mr. Manzer told you that it was his

17   opinion that the shingles became unsealed as a result

18   of the windstorm that occurred in July of 2016?

19       A.  Correct.

20       Q.  This isn't what Mr. Smith told you, this is

21   what Mr. Manzer told you?

22       A.  Correct.

23       Q.  Now, Mr. Smith said that a house down the

24   street was insured by AAA and had its roof replaced,

25   is that correct?



1    A.   Correct.

2    Q.   What house, do you know the address of that

3    house?

4    A.   No, I do not.

5    Q.   So, he just arbitrarily pointed down the

6    street generally in that direction and said there's a

7    house down there?

8    A.   Yes.

9    Q.   You don't know which house he was talking

10   about?

11   A.   I know where about it is on the street, but I

12   couldn't give you the address or the gentleman's

13   name.

14   Q.   Do you know how many houses down the street?

15   A.   Eight to ten possibly.

16   Q.   East or west, north or south?

17   A.   That would be north.

18   Q.   Did he tell you why AAA purportedly replaced

19   that roof?

20   A.   Because it was almost as bad as mine.

21   Q.   Did he say it was wind damage, other damage,

22   did he say the cause, the reason that they actually

23   replaced the roof?

24   A.   He said that it was replaced.

25   Q.   You don't know why it was replaced?



1        A.   Due to the storm.

2        Q.   He told you due to the storm in July of 2016

3    a roof about eight to ten houses down was replaced by

4    AAA?

5        A.   Correct.

6        Q.   And do you know the condition of that house,

7    how old it was, what maintenance had been performed,

8    what type of roof, anything regarding that house?

9        A.   No, I do not.   I assume it's ten to eleven

10   years old like mine.

11       Q.   Did he tell you who the adjustor that came out

12   and inspected the house was when the roof was agreed

13   to be replaced?

14       A.   No, he didn't.   He said it was a AAA field

15   adjustor that came out the second time and bought the

16   roof within minutes.   That's when we asked Mickey and

17   he said, you get two shots and that's it as far as the

18   inspection goes.

19       Q.   Mickey told you you get two shots, that's it?

20       A.   Uh-huh, yes.

21       Q.   Those are his exact words?

22       A.   Yes.

23       Q.   After Mr. Manzer's inspection did you speak to

24   Mr. Smith?

25       A.   Yes.



1    Q.  Now, just a second ago you testified that

2   Mr. Ryan Smith and you agreed with Mickey Manzer that

3   the roof was totalled and there was installation

4   issues.  Are you changing your testimony?

5    A.  I'm changing my testimony to that Ryan and I

6   agreed that the roof was totalled.

7    Q.  And it is now your testimony that you did not

8   agree that there was installation issues?

9    A.  Correct.

10    Q.  Why are you now changing your testimony?

11    A.  Because I didn't understand your full question

12   at the time.

13    Q.  What did Mr. Ryan Smith tell you regarding

14   Mr. Manzer's opinions related to the installation

15   issues on your roof?

16    A.  I'm sorry?

17    Q.  What did Ryan Smith tell you regarding his

18   opinions that Mr. Manzer believed there was

19   installation issues on the roof?

20     MR. McGREW:  I don't understand your question.

21   I'm sorry.  Can you rephrase that.

22    Q.  (BY MR. ROONEY)  Ryan Smith, what did Ryan

23   Smith tell you regarding his opinions of Mr. Manzer's

24   assessment that there was installation issues with

25   your roof?



1      A.   I don't recall Mr. Manzer saying anything

2   about the installation.  He said that the roof was

3   totalled and that if it was any other carrier they

4   would buy the roof.

5      Q.   So, Mr. Manzer never told you that he saw

6   installation issues on your roof?

7      A.   Not that I recall.  He said that the roof was

8   totalled and that if it was up to him he would buy

9   the roof, that the roof needed to be replaced because

10  of the storm, the wind damage.  And Ryan and I agreed

11  to that.

12     Q.   To your knowledge, did Ryan Smith send any

13  pictures in to CSAA on your behalf?

14     A.   I believe he tried, but I ultimately had ended

15  up having to send them.

16     Q.   You've seen the pictures that were submitted

17  to CSAA in order to get the second inspection,

18  correct?

19     A.   Yes.

20     Q.   Did you discuss those pictures with Ryan

21  Smith?

22     A.   No.

23     Q.   He just told you, I can't get them to upload,

24  could you get those over to CSAA for you?

25     A.   Yes.

