EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

KYLE GOINS AND KARI          )
GOINS,                       )
                             )
            Plaintiffs,      )
                             )
v.                           )CASE NO. 17-CV-347-JHP-JFJ
                             )
CSAA FIRE & CASUALTY         )
INSURANCE COMPANY,           )
                             )
            Defendant.       )


VIDEOTAPED DEPOSITION OF RYAN SCOTT SMITH

TAKEN ON BEHALF OF THE PLAINTIFFS

IN TULSA, OKLAHOMA

ON FEBRUARY 6, 2018


REPORTED BY:  KERRI L. WOOD, CSR

Ryan Smith                                    February 6, 2018

                                                    Page 2

 1                  A P P E A R A N C E S

 2

 3

 4    For the Plaintiffs:    MATTHEW M. McGREW
                             Attorney at Law
 5                           Michael D. McGrew & Associates
                             400 North Walker Avenue
 6                           Suite 115
                             Oklahoma City, Oklahoma  73102
 7                           (405)235-9909
                             mcgrewslaw@yahoo.com
 8

 9
      For the Defendant:     GERARD F. PIGNATO
10                           Attorney at Law
                             Pignato, Cooper, Kolker &
11                            Roberson
                             119 North Robinson Avenue
12                           11th Floor
                             Oklahoma City, Oklahoma  73102
13                           (405)606-3333
                             jerry@pclaw.org
14

15
      Videographer:          JIM LANGLOIS
16

17

18

19

20

21

22

23

24

25

                D&R REPORTING & VIDEO, INC.
            (800)771-1500 / depo@drreporting.com

Ryan Smith                                February 6, 2018

1   that's fine.  Take the desire out of my heart.  If

2   it is, you're going to have to help open the door

3   for me."

4           And that year, I killed the third largest

5   whitetail ever harvested in front of a video camera;

6   and that kind of launched my outdoor hunting career.

7   And I later signed with Knight & Hale's Ultimate

8   Hunting and Summit's High Places and -- and started

9   filming and -- for the outdoor TV.  I had about

10  24 hunts on TV in 4 years.

11      Q    Are you still doing that?

12      A    I am.  I am.  I -- I do -- I do a lot more

13  filming right now than I do anything -- filming

14  other guys and stuff.  So --

15      Q    Okay.  Wrapping up your background, have you

16  ever been convicted of or pled guilty to a -- a

17  crime -- a felony or a misdemeanor -- involving any

18  dishonesty?

19      A    No.

20      Q    How did you first become involved in the

21  Goins' roof claim that we're here about today?

22      A    My previous partner from Roberts Roofing --

23  actually, that was his old name -- Right Now

24  Roofing, he had sent me out on -- we were -- we had

25  some leads that come in from HomeAdvisor and such;

Ryan Smith                                    February 6, 2018

```
 1   and he sent me to a residence in that neighborhood.

 2          And I got up on the roof; inspected it; told

 3   the -- told the homeowner, as always, you know,

 4   if -- if there's -- the -- the damage is there, then

 5   I encourage them to make an insurance claim.  If

 6   it's not, then I don't waste their time; I don't

 7   waste the insurance company's time.  This particular

 8   roof that I got on was in bad shape.  So, I -- I

 9   believe that was an Allstate claim.  Their roof got

10   paid for.  We did it.

11          I noticed several houses in the neighborhood

12   that were missing shingles or whatnot, had damage --

13   noticeable damage.  I did knock on a couple doors,

14   gave them my card, let them know that we were doing

15   that particular -- and that kind of opened it up.

16          And then I actually did the house next to

17   Mr. Goins' and the house next to it on -- next to

18   it, and then I did the one on this side

19   (Indicating).  Then I went and did one two doors

20   down.

21          And I approached Mr. Goins, and -- and I

22   could tell that he had some patchwork done.  And I

23   had asked him if -- if he cared for me to inspect

24   his roof.  And he said that he had already had it

25   inspected and that, you know, they were -- you know,
```

1   it didn't get bought, whatever; the insurance

2   company didn't take care of it.

3        And I said, "Okay." I said, "Well, if you

4   have any questions, call me."

5        Well, we ended up doing -- between the

6   two companies, I ended up doing, like, 17 houses in

7   that neighborhood and 13 in a 2-block span. And

8   Mr. Goins called me, I believe, in early May -- I

9   want to say early May, late April. And after all

10  these roofs were getting done in his neighborhood,

11  he was a little confused. He was a little upset.

12  He didn't understand.

13       And he said, "Hey, everybody says you're the

14  one to talk to."

15       So, I volunteered to come out, take a look.

16  So, I thoroughly inspected his roof for about

17  40 minutes one day, got down.

18       I said, "You know, I -- it's beyond me how

19  the insurance company didn't pay for your roof." I

20  said, "It's the second worst roof I've been on in

21  this neighborhood."

22       And -- and he said, "Well, what can we do?"

23       And I said, "Well, give me your claim

24  papers; and -- and I'll -- let's see if I can't get

25  another ins- -- adjuster out here to -- to inspect

Ryan Smith                                    February 6, 2018

1    it with me."

2            And -- and I had asked him if the

3    adjuster -- or if the adjuster had met with another

4    contractor at the time.  He -- he had told me that

5    he thought that T-Town, I believe, had been on the

6    roof with him.

7            So, I made some phone calls and -- and --

8    and finally got -- got in touch with somebody.  And

9    they told me that they needed photographs, to send

10   in some photographs with some damage and then they

11   would look at the photographs and decide if it

12   was -- if it warranted a second inspection.

13           And, so, I did that; and I tried to send a

14   bunch of the photographs in.  They wouldn't go

15   through, for some reason.  I couldn't get them --

16   hardly any of them to go through.  So, I actually

17   forwarded -- I sent them to Kyle, which then he sent

18   in.  And that was kind of the extent of it.

19           And -- and then we ended up, you know,

20   meeting later with another adjuster.

21      Q    Let me try to unpack some of that.  You --

22   you got involved in the work in the Goins'

23   neighborhood with an Allstate claim.  You said one

24   of --

25      A    I believe --

Ryan Smith                                    February 6, 2018

1      Q      -- Mr. Goins' neighbors.

2      A      Yeah.   I ended up -- there were 6 or

3  7 insurance companies involved in -- in those

4  13 jobs we did in those 2 streets.

5      Q      Now, you said those roofs were in bad shape.

6  Were you finding wind damage on those roofs?

7      A      Fin- -- finding wind damage on all of them.

8  But two of them were bought on hail; but, primarily,

9  they were all bought on wind.

10     Q      Primarily, they were damaged by wind because

11 the shingles had been unsealed, correct?

12     A      Unsealed and, in most cases, actually,

13 the -- even further, they had been pulled from many

14 of the nails.   They had ripped through the nails.

15             MR. PIGNATO:   I'm going to object to

16 the form of the question.

17     Q      (By Mr. McGrew) That's one of the objections

18 I talked about that --

19     A      Okay.

20     Q      -- that will happen from time to time.

21            Now, how close were these -- I think you --

22 you said 17 and then 13.  So, how many homes have

23 you roofed in the neighborhood, first?

24     A      In the neighborhood, 17.   And when I

25 consider the "neighborhood," it would be those two

Ryan Smith                                February 6, 2018

Page 19

1   streets -- see, the way the neighborhood's set up,

2   you pull in.  There's a real short street here.  And

3   then Mr. Goins' street's down here.  And then you

4   have two northwest -- or north-south-running streets

5   like this (Indicating).  We did 13 in that little

6   pack.  But if you go over to the next 2 streets

7   over, we did an -- an additional 4 over in that

8   neighborhood.

9        Q    And how close are these homes to Mr. Goins'

10  house that AAA took the position was not damaged by

11  wind?

12       A    Next door.  That -- we did five on Goins'

13  street alone.  In fact, the first house is here;

14  second house is here.  We did both of those.  And

15  then Mr. Goins' house sits here.  Then there's a

16  neighbor that we did, and then there's a house here

17  that I never did talk to.  And then the next one

18  down, we did that, some right across the street, all

19  up and down the street (Indicating).

20            In fact, AAA actually bought one right at

21  the other end of the street earlier that -- prior to

22  Mr. Goins' situation where I got back on his roof.

23       Q    And you were --

24       A    So --

25       Q    -- involved in that claim?

Ryan Smith                                    February 6, 2018

Page 35

1   damaged by wind?

2       A    That's correct.

3       Q    And you don't agree with that?

4       A    I disagree completely.

5            MR. PIGNATO:  Object to the form.

6       Q    (By Mr. McGrew) Did he inform you in that

7   call that he won't be the guy going out there to do

8   your reinspect?

9       A    He did.  And he actually gave me the new

10  adjuster's number, and then I got in touch with him.

11      Q    You called -- excuse me.

12      A    I -- I called Mickey, the -- the gentleman;

13  but I didn't get -- I tried to get in touch with

14  him, but I didn't get -- I didn't get an answer.

15  So, I didn't speak with the new adjuster, Mickey,

16  until we were on the job site.

17      Q    So, going to that inspection with

18  Mickey Manzer, did you have any communication with

19  AAA prior to that inspection, that we haven't talked

20  about?

21      A    No.

22      Q    Okay.  Tell me about the -- the

23  reinspection.

24      A    Well, I got there and -- I probably got -- I

25  probably beat Mickey there by -- I don't know -- 10,

D&R REPORTING & VIDEO, INC.
(800)771-1500 / depo@drreporting.com

Ryan Smith                                    February 6, 2018

Page 36

1    12 minutes.   Kyle and I was just outside, shooting

2    the breeze, catching up, talking about various

3    things.   And -- and Mickey pulled up.   And he come

4    up.   Kyle and I were standing by the garage door.

5         He asked me what we had up there -- "What do

6    we have up here, Ryan?"

7         And -- and I told him that we had

8    significant han- -- wind damage.

9         And he said, "Look, I'll just tell you guys

10   now:   If you want me to buy this thing on wind, I

11   can't do it."

12        And I said, "Well, what do you mean you

13   can't do it?"

14        And he said, "Look, I've got strict

15   guidelines from my boss; and we can't buy it.   If

16   it's not a missing shingle, if it's not creased,

17   it's not wind damage in AAA's eyes."

18        And I said, "Well, how can you blanket that

19   bef- -- this took -- this should be a case-by-case

20   basis."

21        And he's like, "I'm just telling you."   And

22   he said, "I tried to pass one through last week on

23   wind; and my boss come to me and said, 'What the

24   hell are you doing?'"

25        And I said, "So, you" --

Ryan Smith                                    February 6, 2018

Page 37

1     Q     May I interrupt you?

2     A     You bet.

3     Q     Who -- did he say who that boss was?

4     A     He didn't.  He just said his boss.

5     Q     Did he say that that was a boss with AAA or

6     with his company -- his independent adjusting

7     company?

8     A     I -- that, I can't tell you.  I -- I --

9     Q     Go ahead.  Keep -- keep telling me about --

10    A     So --

11    Q     -- the reinspect.

12    A     I said, "So, is there no reason to even get

13    up there on this thing or what?"

14          And he's like, "Well, if you're telling me

15    it's wind damage, I probably don't need to get up

16    there."

17          And I said, "Well, I'd like -- I'd like for

18    you to get up there and let me show you."

19          And, so, we -- we got up there; but it

20    wasn't -- it wasn't very long.  I mean, we -- we

21    weren't on that roof probably -- I don't know --

22    maybe -- maybe 15 minutes, tops.

23          And he started pulling up -- he started

24    pulling up shingles, taking pictures.

25          And I said, "I'm not -- what exactly are you

 1   taking pictures of?"

 2          And -- and he said, "Oh, it's ju- -- I just

 3   need it for my records."

 4          And I said, "Okay."  And I said, "Are you

 5   going to sit there and tell me you don't think this

 6   is wind damage?"

 7          He said, "Ryan, I can't -- I ca- -- I can't

 8   tell you one way or the other.  All I can tell you

 9   is we -- we cannot buy a roof on wind unless they're

10   missing shingles or they're creased."

11          And I said, "Okay."

12          And he's a very pleasant guy.  I liked the

13   guy.  But I think his hands were tied.  So --

14     Q    Did you show him, when you were on the roof

15   with him, all of the things that you believed to be

16   wind damaged on --

17     A    Yep.

18     Q    -- the roof?

19     A    Yep.  I showed him everything.

20     Q    About how long were you on the roof?

21     A    12 to 15 minutes, tops.

22     Q    Did you-all get on every slope?

23     A    Didn't get on the east slope.

24     Q    Okay.

25     A    I kind of bent over -- kind of bent over the

Ryan Smith                                    February 6, 2018

Page 39

1    ridge to try to -- to show him the top of some

2    damaged shingles on that side, but we never actually

3    stepped on that east slope.  So --

4         Q    So, you got down off the --

5         A    Got down off --

6         Q    -- roof at --

7         A    -- the roof.

8         Q    -- that point.

9         A    He actually -- Mickey started talking again.

10   He told -- I went to -- I actually -- soon as I got

11   down off the roof, I ran to my truck to get a

12   cigarette and I come back and we were just visiting.

13   And Mickey had made a comment to Kyle that he had

14   another option.

15        Q    Uh-huh.

16        A    And he said, "Another option you have is,

17   you know, you can" -- he said, "Every other

18   insurance company would probably buy this roof."  He

19   said, "Your other option is change insurance

20   carriers and wait till you get a wind or hailstorm

21   and -- and then pass it through theirs, and then

22   you'll get it taken care of," which I thought was

23   kind of wrong.

24             But I think that the -- the friendly

25   environment that we were -- we were showing, I

Ryan Smith                                        February 6, 2018

Page 40

1     th- -- you know, he was a -- he was a -- he was a

2     nice guy.  But he had given Kyle that option.

3         Q     He told Mr. Goins, in other words, that he

4     should just get a different insurance company --

5               MR. PIGNATO:  Object to --

6         A     He sug- --

7               MR. PIGNATO:  -- the form.

8         Q     (By Mr. McGrew) -- and --

9         A     He suggested he could, that was an option.

10        Q     And have them pay for the damage that you

11    were trying to show that occurred during AAA's

12    policy?

13        A     Correct.

14              MR. PIGNATO:  Object to the form.

15        A     Correct.

16        Q     (By Mr. McGrew) Did you ever tell Mr. Manzer

17    that -- that you had been on another roof with AAA

18    in the neighborhood and they subsequently paid to

19    replace it?

20        A     I did.  And I told him that the original

21    adjuster -- which was an independent -- that handled

22    the roof -- and -- and -- and I pointed this out to

23    him.  We were -- his garage -- the -- the house

24    faces to the north.

25              And I -- I said, "If you drew a straight

Page 41

1    line to the end of this street" -- I said, "In fact,

2    you can see the -- the wood fence out there."  I

3    said, "Do you see that house?"  I said, "AAA bought

4    that house."  I said, "But the independent adjuster

5    that come out -- without me being there -- denied

6    the roofs (sic), claiming there was damage, but not

7    enough to total the roof."  I said, "But when I

8    asked for another adjuster, AAA sent their own out;

9    and he took care of it."

10         He said, "I'm not going to deny that."  He

11   said, "AAA would probably buy this one," he said,

12   "because a AAA adjuster has more power than I do."

13   He goes, "I have strict instructions by my boss."

14         And -- and apparently -- and -- and -- and

15   I'm just saying this.  But apparently that came from

16   AAA, but I don't know.

17         He just said his boss -- "If it's not

18   creased, if they're not missing, it's not wind

19   damage."

20         And, so, I told him -- and I said, "Can I

21   get the AAA guy out here, then, if he's got more

22   power than you?"  I said, "Because I'm telling you

23   this roof's a lot worse than that one and they

24   totaled that roof."

25         He said, "You've had your second adjustment.

Ryan Smith                                    February 6, 2018

                                                      Page 42

1    They're not going to -- they're not going to give

2    you a third one."

3              MR. PIGNATO:  Move to --

4    A    And I said --

5              MR. PIGNATO:  Go ahead.

6    A    And I said, "Can I -- can I call and ask?"

7         He said, "You can call and ask, but you're

8    not going to get anywhere."

9         And, so, that was -- that was the extent of

10   our conversation.

11             MR. PIGNATO:  Move to strike as

12   nonresponsive.

13   Q    (By Mr. McGrew) At the conclusion of

14   Mr. Manzer's inspection, you asked to see if AAA

15   could bring a in-house adjuster out to look at it

16   with you, correct?

17   A    Correct.

18             MR. PIGNATO:  Object to the form.

19   Q    (By Mr. McGrew) And he said, "No.  You've

20   had two inspections.  That's" --

21   A    "That's all they're going to allow."

22             THE WITNESS:  Is that my Diet Coke?  It

23   was sitting right here.

24             THE COURT REPORTER:  Yes.

25             THE WITNESS:  Thank you.

Ryan Smith                                      February 6, 2018

Page 43

1              MR. McGREW:  I'll mark this as

2    Exhibit 3.

3              (Plaintiff's Exhibit Number 3 marked for

4    identification and made part of the record.)

5       Q    (By Mr. McGrew) Sir, this is a Loss Report

6    produced as part of AAA's claim file, Bates number

7    177.  This is a reinspection report filled out by

8    Mickey Manzer following your inspection.  I'd like

9    to bring your attention to the -- the second

10   paragraph under the "REINSPECTION" heading, second

11   line down.

12             It says:  On every slope there were shingles

13   with the left nail pulled through the shingle.  In

14   many cases these shingles had only 3 nails installed

15   and they were over driven (sic).

16             Is that conclusion consistent with anything

17   you've found during your inspections of the Goins'

18   roof?

19      A    Absolutely not.

20      Q    You haven't seen a problem with overdriven

21   nails, have you?

22      A    No.

23             MR. PIGNATO:  Object to the form.

24      Q    (By Mr. McGrew) You haven't seen a problem

25   on the Goins' roof where it's installed with three

Ryan Smith                                          February 6, 2018

Page 44

```
 1    nails instead of four?
 2              MR. PIGNATO:  Object to the form.
 3        A     I probably looked at 90 percent of that
 4    roof, and there (sic) not a shingle on there that
 5    only had three nails on it.  I -- I think -- in my
 6    professional opinion, I think Mr. Manzer -- as bad
 7    as this may seem because he's an adjuster, I truly
 8    feel like why he was only seeing three shingles
 9    (sic) -- the way you lay a shingle, you get --
10    supposed to have a nail here, a nail on the thirds,
11    and a nail over here (Indicating).
12              Well, the end of the shingles that he's
13    taking pictures of and looking at is covered -- the
14    last, I'm going to say, fifth of the shingle is
15    covered by the next row up; and he never bothered to
16    lift that to show the fourth nail on every shingle,
17    you know.
18              MR. PIGNATO:  Move --
19        A     And I -- so, for him to say that there's
20    three nails per shing- -- per shingle, there --
21    there wasn't a -- there wasn't a shingle on that
22    roof -- unless the nail had actually been completely
23    pulled out -- that only had three nails; but even
24    then, they would have had four nails.  And I looked
25    at 90 percent of that roof.
```

Ryan Smith                                    February 6, 2018

Page 45

1              MR. PIGNATO:  Move to strike as

2     nonresponsive.

3         Q    (By Mr. McGrew) You never saw a single

4     instance where a shingle had been installed with

5     three nails instead of four?

6         A    Absolutely --

7              MR. PIGNATO:  Object to --

8         A    -- not.

9              MR. PIGNATO:  Object to the form.

10        Q    (By Mr. McGrew) And I think what you're

11    talking about is when you pick up an unsealed

12    shingle, three of the installation nails would be

13    exposed; but the fourth one is covered by the

14    shingle adjacent to it.

15        A    Correct.

16             MR. PIGNATO:  Object to the form.

17        Q    (By Mr. McGrew) And to do a proper

18    inspection --

19        A    Actually --

20        Q    -- for --

21        A    -- it's covered -- I got to -- I got to --

22        Q    Sure.

23        A    -- correct you there.

24        Q    Sure.

25        A    It's not --

Ryan Smith                                    February 6, 2018

     1      Q     Go ahead.

     2      A     -- covered by the shingle next to it.  It's

     3   covered by the shingle above it and next to it.

     4      Q     You're right.  It's --

     5      A     So --

     6      Q     -- covered by the shingle that sits above it

     7   and --

     8      A     Correct.

     9      Q     -- adjacent to it.

    10      A     Correct.

    11      Q     And to do a proper inspection to determine

    12   the number of nails on installation, you have to

    13   pick up both of those shingles to look --

    14            MR. PIGNATO:  Object --

    15      A     You've got --

    16      Q     (By Mr. McGrew) -- right?

    17      A     -- to --

    18            MR. PIGNATO:  Object to the form.

    19      A     You've got to pick up the last, I'm going to

    20   say, 7 inches -- 6 to 7 inches of this shingle right

    21   here to see the fourth nail in that -- in this

    22   shingle.

    23            And the only time I found three nails in a

    24   shingle on that roof, there weren't technically only

    25   three nails.  There were three nails that still

Ryan Smith                              February 6, 2018

Page 51

1     A     Yes.

2     Q     (By Mr. McGrew) They were not overdriven or

3  underdriven?

4     A     No --

5           MR. PIGNATO:  Object to the form.

6     A     -- not in my opinion.

7     Q     (By Mr. McGrew) When Mickey Manzer stepped

8  out of his truck and told you, "There's no way that

9  I can buy this on wind," he said that before he'd

10  ever even looked at the Goins' roof, correct?

11     A     Before we ever even got on it.

12           MR. PIGNATO:  Object to the form.

13     Q     (By Mr. McGrew) He told you it was AAA's

14  policy that they don't pay for wind damage unless

15  the shingles are creased, torn, or blown from the

16  roof, correct?

17     A     That's correct.

18           MR. PIGNATO:  Object to the form.

19  Repetitive.

20     Q     (By Mr. McGrew) Did he give you any details

21  about the claim that he said, I think your words

22  were, he tried to push through and couldn't?

23     A     He didn't say.

24     Q     But he did tell you that he tried to buy a

25  roof on wind that was a AAA claim, but that his boss

Ryan Smith                                February 6, 2018

```
                                                    Page 52

 1   came to him and said --

 2       A    "What the hell are you doing?"

 3              MR. PIGNATO:  Object to the form.

 4   Repetitive.

 5       Q    (By Mr. McGrew) Those were his words, not

 6   yours, right?

 7       A    That's correct.

 8       Q    There's no question, in your mind, that the

 9   Goins' roof was damaged by wind that happened in

10   July of 2016, right?

11              MR. PIGNATO:  Object to --

12       A    Absolutely --

13              MR. PIGNATO:  -- the for- --

14       A    -- no question.

15              MR. PIGNATO:  Object to the form.

16       Q    (By Mr. McGrew) Of all the insurance

17   companies that you were dealing with in the Goins'

18   neighborhood, fixing storm damage as a result of the

19   July, 2016, storm, was AAA the only carrier that

20   refused to acknowledge the existence of wind damage

21   on these roofs?

22       A    Yeah, and they did it on two.  They did it

23   on Mr. Goins' and another one up the street, but I

24   did not handle the adjuster meeting on that one.  I

25   inspected it, but my partner handled that one.  And
```