EXHIBIT 4 - AS REDACTED

Robert Haar                                              January 5, 2018

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

1. KYLE GOINS                    )
2. KARI GOINS,                   )
   Plaintiffs,                   )
                                 )
VS.                              ) CASE NO.:
                                 ) 17-CV-347-JHP-JFJ
1. CSAA FIRE & CASUALTY          )
INSURANCE COMPANY, a             )
foreign for profit               )
insurance corporation,           )
   Defendant.                    )

---

ORAL AND VIDEOTAPED DEPOSITION OF
ROBERT SHANE HAAR
JANUARY 5, 2018, VOLUME 1

---

ORAL AND VIDEOTAPED DEPOSITION OF ROBERT SHANE HAAR, produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on January 5, 2018, from 11:27 a.m. to 2:26 p.m., before Jamie K. Israelow, a Certified Shorthand Reporter in and for the State of Texas, Registered Merit Reporter and Certified Realtime Reporter, reported in machine shorthand at the DoubleTree Hotel, located at 3300 W. Mockingbird Lane, in the City of Dallas, County of Dallas and State of Texas.

PAGES DESIGNATED AS CONFIDENTIAL
Page 64, Line 20 through Page 69, Line 20
Page 72, Line 5 through Page 73, Line 16
Page 130, Line 8 through 133, Line 3
Page 137, Line 7 through 138, Line 12

```
                                                            Page 2
 1                      A P P E A R A N C E S

 2    FOR THE PLAINTIFFS:

 3            Matthew McGrew, Esq.
              MCGREW, MCGREW & ASSOCIATES, PC
 4            400 N. Walker, Suite 115
              Oklahoma City, Oklahoma   73102
 5            405.235.9929
              mcgrewslaw@yahoo.com
 6

 7    FOR THE DEFENDANT:

 8            Erin J. Rooney, Esq.
              PIGNATO, COOPER, KOLKER & ROBERSON, PC
 9            Robinson Renaissance Building
              119 North Robinson Avenue, 11th Floor
10            Oklahoma City, Oklahoma   73102
              405.606.3333
11            erin@pclaw.com

12

13    ALSO PRESENT:

14        Kevin Dill, Videographer

15

16

17

18

19

20

21

22

23

24

25
```

Robert Haar                                                January 5, 2018

Page 44

1     A.    Okay.
2     Q.    Did you ever see or observe any nails on the
3  Goins' roofing surface that were either overdriven or
4  underdriven?
5           MR. ROONEY:  Object to form.
6     A.    No.
7     Q.    (By Mr. McGrew)  Your answer was no?
8     A.    No.  I mean, I didn't see what -- the only
9  thing I saw was on top of the roof itself.  I wasn't
10 looking underneath shingles or anything.
11    Q.    Did you ever observe during your inspection any
12 instances where the shingles had, in your opinion, an
13 inappropriate number of fasteners?
14    A.    I -- I couldn't see that.
15    Q.    You -- you couldn't see it because you never
16 looked at the -- underneath the shingle?
17          MR. ROONEY:  Object to form.
18    A.    Right.
19    Q.    (By Mr. McGrew)  Okay.  So you don't know
20 whether the Goins' roof, the shingles have three nails,
21 four nails or some other number of nails?
22    A.    That's right.  I -- I don't know how many nails
23 were placed on each shingle.
24    Q.    You don't know that sitting here now and you
25 didn't know that back when you were involved in the

Robert Haar                                          January 5, 2018

                                                              Page 45

1    claim?
2         A.    That's correct.
3         Q.    You gave a -- well, let me ask you this:
4    You're -- you've been an adjuster a long time, right?  I
5    consider it a long time, since about 2008.
6         A.    Yes.
7         Q.    What do you believe good faith and fair dealing
8    means?
9         A.    Good faith and fair dealing?
10        Q.    Uh-huh.
11        A.    You go out to an inspection, take in all
12   evidence from everybody that's there, try to conduct a
13   fair inspection.
14        Q.    And follow the policy?
15        A.    And follow the policies.
16        Q.    Do you believe that following the policy's
17   important, right?
18        A.    It's in place, yes, for us to have so we can
19   follow.
20        Q.    And it's important to follow it?
21        A.    Right.
22        Q.    So if the Goins' policy provides coverage for
23   direct physical loss, then it's important that a
24   first-party adjuster acting in good faith identify
25   direct physical loss and issue payment for it so long as

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Robert Haar                                          January 5, 2018

Robert Haar                                          January 5, 2018

Page 72

1   Q.   And you observed evidence that that had been
2   done on the Goins property and you testified to that,
3   correct?
4   A.   Yeah, the -- there was evidence of that.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

17          MR. MCGREW:  I'm going to mark your photos
18     as Exhibit 3.
19               (Exhibit 3 was marked.)
20     Q.   (By Mr. McGrew)  You recognize these as your
21     photos that you took during your inspection on
22     December 11th, 2016?
23     A.   Yes.
24     Q.   Did you take any photos other than the ones
25     included here?

Robert Haar                                          January 5, 2018

Page 83

1    Q.   (By Mr. McGrew)  Nothing was pulled up by you
2    to look for.  Is that what you just --
3    A.   Yeah, no shingles were pulled up.  I did not
4    pull up any shingles.
5    Q.   You never looked under any shingle on the Goins
6    roof at all?
7    A.   Right.
8    Q.   You never lifted up on the edge of the tabs to
9    see if they were unsealed?
10   A.   No.
11   Q.   No, you didn't?
12   A.   No.
13   Q.   Okay.  On Page 58, you -- you have a couple of
14   photos of the ridge.  Is the same true with respect to
15   the ridge, that you never lifted up on the ridge to see
16   if it was unsealed?  You never looked under it to see if
17   there was adhesive transfer or debris lodged under it?
18   A.   No, that was not done.
19   Q.   You never did that during the Goins inspection?
20        MR. ROONEY:  Object to form.
21   A.   No.
22   Q.   (By Mr. McGrew)  And I asked a compound
23   question, and that's why Mr. Rooney objected to it.  So
24   I'm going to break it up into two separate parts.
25             You never lifted up on the ridge of the

Robert Haar                                         January 5, 2018

Page 84

1   Goins roof to see if the ridge shingles were unsealed?
2       A.   No.
3       Q.   You never looked under the shingles of the
4   ridge to see if there was debris lodged under there or
5   if there was adhesive transfer?
6       A.   No.
7       Q.   If you had looked under the shingles of the
8   Goins roof and found that there was adhesive transfer
9   and that the fasteners had been pulled through, would
10  you have considered that to be wind damage?
11              MR. ROONEY:  Object to form.
12      A.   I would have looked at all the evidence in
13  front of me at that time.
14      Q.   (By Mr. McGrew)  You would have done further
15  investigation?
16      A.   I would have took in that -- that evidence and
17  made a determination on it.
18      Q.   And I'm asking you what determination you would
19  have made if you had lifted the shingles up and had
20  observed the things that AAA's guidelines point to when
21  identifying wind damage, like debris blown up under the
22  shingles, shingles which had been pulled through the
23  fasteners, zipper patterns, so on and so forth.
24              If you had lifted those shingles up and
25  observed that, how would that have affected your

1   condition since your inspection in December.
2             MR. ROONEY:  Object --
3       Q.   (By Mr. McGrew)  Does that make sense?
4             MR. ROONEY:  Object to form.
5       A.   Not really.
6       Q.   (By Mr. McGrew)  Let me ask you a better
7   question.  It wasn't a very good question.
8             You can see in these photos that the
9   shingles are unsealed.  You've already testified to
10  that, right?
11      A.   Yes.
12            MR. ROONEY:  Object to form.
13      Q.   (By Mr. McGrew)  You said yes?
14      A.   I said we can see them, yes.  They're --
15  they're -- somebody has lifted them up.
16      Q.   Well, Mickey Manzer is lifting them up in the
17  photos.  Is that what you mean?
18      A.   I see two different hands, so I don't know if
19  one is a contractor or somebody up there with him.
20      Q.   Or it could be at one time he had gloves and at
21  one time he didn't, right?
22            MR. ROONEY:  Object to form.
23      A.   Well, I'm just --
24      Q.   (By Mr. McGrew)  It's possible?
25      A.   I'm here.  Yeah.  I mean, the -- the angle

Robert Haar                                           January 5, 2018

Page 98

1  itself would mean somebody else is up there with him at
2  that time lifting that shingle up.
3      Q.   But nonetheless, I'm not trying to ask you a
4  trick question.  I probably created a mess in the record
5  right now so I want to try and clear it up.
6           The -- the condition that Mickey Manzer is
7  documenting in these photographs is that the Goins
8  shingles are unsealed?
9           MR. ROONEY:  Object to form.
10     A.   That's what it looks like the contractor or
11 somebody is showing here, yes.
12     Q.   (By Mr. McGrew)  Okay.  And you never observed
13 that when you were out at the Goins property in
14 December, correct?
15     A.   Correct.
16     Q.   And you've said you didn't observe it because
17 you never made that type of assessment, right?
18          MR. ROONEY:  Object to form.
19     A.   Right.
20     Q.   (By Mr. McGrew)  So since we know it was like
21 this in May of 2017 but we don't know what it was like
22 when you were out there because you never lifted up on
23 the shingles, one of two things either happened, in my
24 mind, and there could be more, but you tell me.  Okay?
25 Either they were in this condition when you were out

Robert Haar                                          January 5, 2018

Page 108

1    A.   Okay.  Sorry.
2    Q.   So if wind did blow up the shingles on the
3    Goins roof and pulled them through their fastener, you
4    would consider that to be covered damage under the terms
5    and conditions of their policy?
6    A.   Yes.
7    Q.   Because that's direct physical loss --
8    A.   Yes.
9    Q.   -- correct?
10   A.   Uh-huh.
11   Q.   If a windstorm came through and blew the
12   shingles of the Goins roof up and created a sealant
13   strip adhesive transfer, you would consider that to be
14   covered damage under the terms and conditions of the
15   Goins policy?
16   A.   Yes.
17   Q.   Because that's direct physical loss, right?
18   A.   Right.
19   Q.   I want to hand you a copy of a --
20        THE REPORTER:  You want to mark this?
21        MR. MCGREW:  Yes.  I forgot my exhibit
22   number, though.
23        THE REPORTER:  6.
24        (Exhibit 6 was marked.)
25   Q.   (By Mr. McGrew)  Mr. Haar, have you ever seen

1     Q.    Mr. Manzer is talking about his reinspection.
2  And this is the same reinspection that Ryan Smith with
3  High Choice Construction was mistakenly trying to
4  coordinate with you when he called you, right?
5     A.    Right.
6     Q.    In the second paragraph, he says, quote:  The
7  previous adjuster Shane Haar found improper shingle
8  installation issues throughout the roof.
9           That's not true, is it?
10    A.    Huh-uh.
11    Q.    You didn't find that?
12    A.    Huh-uh.  Except for the toe board nails and
13 that's it.
14    Q.    Sure.  And we've talked about those.  But in
15 terms of improper install or manufacturing defect, you
16 never found any evidence of that?
17    A.    (Witness shakes head.)
18          Not during my inspection.
19    Q.    And you never looked for it either, right?
20    A.    Right.
21    Q.    Do you know where Mickey Manzer got that idea
22 that you had found improper installation issues
23 throughout the entire roof?
24    A.    No, because it's not in my notes.
25    Q.    Excuse me?

Robert Haar                                          January 5, 2018

```
                                                        Page 107
 1      A.   I said it's not in my notes or anything like
 2   that, no.
 3      Q.   He goes on to say that he found three nails all
 4   over the roof and that, quote:  Although this
 5   installation error does make this roof more susceptible
 6   to shingles being blown off the roof, there were no
 7   missing shingles.
 8             If the Goins roof did have three shingles
 9   on it and wind blew shingles off the roof, you believe
10   that would be covered, wouldn't you?
11      A.   You mean three nails?
12      Q.   Yeah.  What did I say?
13      A.   Three shingles.
14      Q.   Let me re-ask the question.
15             If the Goins roof, in fact, had three
16   nails installed in the shingles and a windstorm, a
17   covered peril, came through and blew shingles off the
18   roof, you would consider that to be covered, right?
19      A.   Yes.
20      Q.   What about if a windstorm came through and
21   unsealed the shingles and pulled them through their
22   fasteners, you'd consider that to be covered, correct?
23      A.   If we had the right wind speed to cause that.
24      Q.   I'm asking you to assume for the purpose of my
25   question that wind did cause it.  Okay?
```

Robert Haar                                         January 5, 2018

Page 108

1    A.   Okay.  Sorry.
2    Q.   So if wind did blow up the shingles on the
3    Goins roof and pulled them through their fastener, you
4    would consider that to be covered damage under the terms
5    and conditions of their policy?
6    A.   Yes.
7    Q.   Because that's direct physical loss --
8    A.   Yes.
9    Q.   -- correct?
10   A.   Uh-huh.
11   Q.   If a windstorm came through and blew the
12   shingles of the Goins roof up and created a sealant
13   strip adhesive transfer, you would consider that to be
14   covered damage under the terms and conditions of the
15   Goins policy?
16   A.   Yes.
17   Q.   Because that's direct physical loss, right?
18   A.   Right.
19   Q.   I want to hand you a copy of a --
20        THE REPORTER:  You want to mark this?
21        MR. MCGREW:  Yes.  I forgot my exhibit
22   number, though.
23        THE REPORTER:  6.
24        (Exhibit 6 was marked.)
25   Q.   (By Mr. McGrew)  Mr. Haar, have you ever seen

Robert Haar                                              January 5, 2018

Page 118

1   heat since the time of Mr. Manzer's inspection, you
2   would expect that they would seal back down, right?
3              MR. ROONEY:  Object to form.
4       A.    Possible, yeah.
5       Q.    (By Mr. McGrew)  Have you been instructed by
6   anyone at AAA to not concede the notion that shingles,
7   once they've become unsealed, will not re-adhere?
8       A.    Repeat that again.  I'm sorry.
9       Q.    Has anyone ever told you or instructed you that
10  you shouldn't say that shingles are going to not adhere
11  once they've become unsealed?
12             MR. ROONEY:  Object to form.
13      A.    No.
14      Q.    (By Mr. McGrew)  Sir, if after a long summer
15  worth of heat those unsealed shingles on the Goins home
16  that Mr. Manzer photographed and identified, if they
17  remain unsealed, they're probably not ever going to
18  reseal, are they?
19             MR. ROONEY:  Object to form.
20      A.    Probably not.
21      Q.    (By Mr. McGrew)  Because if they were, you
22  would have expected that to have already happened in the
23  summer, right?
24      A.    Probably.
25             MR. ROONEY:  Object to form.