EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1. KYLE GOINS, | ) |
| 2. KARI GOINS, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| | ) Case No .17-cv-347-JHP-mjx |
| | ) |
| 1. CSAA FIRE & CASUALTY INSURANCE | ) |
| COMPANY, a foreign for profit Insurance | ) |
| Corporation, | ) |
| | ) |
| Defendant. | ) |

## <u>RULE 26 EXPERT REPORT OF SEAN C. PETRONZI</u>

1.      I was originally hired by CSAA in 1990 in the capacity of Property and Bodily Injury Adjuster. I was a CSAA employee for approximately 3-4 years. I was re-hired by CSAA in January 2011 as a Homeowners Adjuster in the Las Vegas Regional Center. I was promoted to National Catastrophe Team Lead in August of 2011. I worked for CSAA in this capacity until May of 2015.

2      As a National Catastrophe Team Lead my responsibilities included the supervision of all inside catastrophe adjusters for CSAA nationwide, including CSAA staff and contract adjusters. I was one of five National Catastrophe Team Leads responsible for approving all loss payments made to first-party insureds, as well as all outgoing denials. I was also charged with the responsibility of reviewing coverage questions brought to me by adjusters, supervisors, team leads, and upper management. I was responsible for drafting responses to complaints filed against CSAA with various state departments of insurance. I was also selected by CSAA on numerous occasions to act as CSAA's corporate representative in litigation, under Rule 30 (b)(6). Additionally, during my career with CSAA I was selected by CSAA's litigation department to review homeowners and catastrophe claims that were involved in pending litigation  I was tasked with reviewing the claim decisions made by CSAA in those claims and determining whether those claims were handled appropriately under the terms and conditions of the policy  If I

determined that these litigation claims were not paid according to the policy terms, it was my responsibility to issue payment for the amount that was owed, plus interest and attorney fees.

3     I was contacted by Mr. McGrew on September 18th, 2017 regarding the Goins claim. I then personally inspected the Goins' roof on December 28th, 2017. I have been asked to provide expert opinions regarding claims handling, insurance industry standards, good faith claim handling practices, and CSAA's handling/adjustment of the Goins' claim. In doing so, I approached this claim as I would have in my capacity as CSAA National Catastrophe Team Lead. I reviewed the claim file in its entirety including photographs taken by Shane Haar and Mickey Manzer; all Xactanalysis notes; and CSAA's Structural Property Estimating Guidelines. Additionally, I have reviewed and relied upon the following documents and information in the formulation of my opinions:

- Deposition of Kyle Goins
- Deposition of Kari Goins
- Deposition of Ryan Smith
- Deposition of Mickey Manzer
- Deposition of Shane Haar
- Deposition of Cecelia Keller (Rough Draft)
- Complaint, Answer, and All Discovery Responses
- Certified Copy of the Insurance Policy
- US Adjusting Subpoena Responses
- My personal inspection of the Goins' Home on December 28th, 2017
- Wind Report Data

I have not testified as an expert witness by deposition or at trial in the last four years. My charges are $150 per hour for review and testimony related to this case.

4.     As stated above, I have reviewed the Goins' claim in order to assess whether or not CSAA's handling of the claim was reasonable and appropriate under the terms and conditions of their policy and whether CSAA acted in a manner consistent with insurance industry standards and good faith claim handling practices. Having reviewed all of the information and after applying my background, knowledge, training, and experience, my opinion is that CSAA's

investigation, evaluation, and lack of payment of the Goins' claim was not consistent with good faith claim handling practices and principles or the terms and conditions of the Goins' insurance policy.

Globally, CSAA has failed to properly oversee and train their adjusters, supervisors, and third-party vendors to acknowledge, document, and issue payment for unsealed shingles caused by wind. Instead, CSAA is training their adjusters only to count and pay for unsealed shingles which are creased, torn, or blown off the roof. My opinion in this regard is based upon the review of the Goins' claim as a whole, my review of other CSAA matters, and the depositions of Mickey Manzer and Shane Haar - the adjusters who inspected the property and failed to adjust for unsealed shingles unless they were creased, torn, or blown off the roof. This is so even after CSAA's Claims Supervisor Cecilia Keller and Shane Haar both testified that wind which has unsealed shingles amounts to direct physical loss. The failure to train their adjusters to account for all direct physical loss caused by covered perils results in an economic benefit to CSAA by reducing its annual exposure to wind claims and shifts those costs onto first party insureds. This approach violates the terms and conditions of the policy, as well as good faith claim handling principles as I understand them.

It is well known in the claims industry that unsealed shingles (1) are typically caused by wind and (2) are highly unlikely to re-seal, particularly on older roofing systems. The adhesive sealant strips on asphalt shingles serves as the primary barrier against wind and water. When shingles become unsealed by wind they are damaged and no longer serve as a protective barrier against the elements, including wind driven rain. Additionally, unsealed shingles will become lifted by subsequent wind events, be pulled through their fasteners and be blown off the roof a few at a time. This further exposes the interior of the home to damage and exposes the decking to the elements, resulting in a loss of roof service life. When I was working for CSAA, newly unsealed shingles caused by wind were considered direct physical loss and were covered under CSAA's HO-5 policy. The Goins' roof is approximately 10 years old and their unsealed shingles caused by the July 14th, 2016 storm, in my opinion, will never reseal. In his deposition, Mr. Haar agreed that the unsealed shingles on the Goins' roof, if still unsealed at the time of his deposition, will never re-seal. (Haar Deposition, Page 118: Lines 14-24). This opinion is supported by the fact that Mickey Manzer observed unsealed shingles on

the Goins' roof during his inspection on May 15th, 2017. If it were true that shingles which have become unsealed by wind, a covered peril, would simply re-seal through exposure to heat, then one would expect that they would be re-sealed today after exposure to the recent hot summer. On December 28th, 2017, I personally inspected the Goins' roof for approximately two hours and observed obvious and extensive wind-caused unsealing of shingles. The wind damage I observed appeared to be recent as the shingles had fresh, black sealant exposed and granular transfer present. Further, I saw no evidence of improper installation on the roof as all shingles appeared to be properly installed with four nails per shingle minimum. This is directly contrary to Mr. Manzer's findings that the shingles on the Goins roof were improperly installed because they had only three nails, which is discussed at greater length below. During my inspection, I did not observe a single shingle which had been fastened with fewer than four nails. In my opinion, the Goins' roof needed to be fully replaced by CSAA as a result of wind damage.

In my opinion, CSAA's refusal to acknowledge and adjust for repair or replacement of unsealed shingles violates good faith claim handling principles because it puts the insured in the position of having to frequently bring multiple claims to address the damaged, unsealed shingles as they blow off the roof. The adjustment of these subsequent claims will typically fall beneath the applicable deductible, leaving the policyholder having to "self-insure" and make repairs or replacement out of pocket for damages which are covered and should have been addressed properly. This is not consistent with good faith claim handling principles or the policy language, because it refuses to acknowledge the obvious: that unsealed shingles caused by wind (a covered peril) is direct physical loss. CSAA's practice of ignoring wind damaged shingles unless they crease, tear, or blow off the roof is not consistent with what I consider to be good faith claim handling principles and insurance industry standards because it applies a different standard to the issuance of claim payments than what is called for in the policy. CSAA's own Structural Property Estimating Guidelines regarding wind damage to roofing systems states:

**Wind Damage**
Inspect the roof for the following conditions:
• Debris lodged underneath the roofing material
• Staples or nails pulling through the shingles

- Creasing of the roofing material
- Seal strip transfer
- Zipper patterns

However, and as discussed at greater length below, Mr. Haar never made any assessment regarding wind damage to the shingles, violating good faith claim handling principles and CSAA's own written guidelines. Further, Mickey Manzer disregarded seal strip transfer, zipper patterns, pulled through fasteners, etc. and instead took the position that CSAA only pays for wind damaged shingles if they are creased, torn, or blown from the roof.

5. A review of the file materials demonstrates that CSAA conducted an unreasonable and inadequate investigation and evaluation of the Goins' claim:

**December 11th, 2016 Inspection:**

Shane Haar inspected the Goins roof on behalf of CSAA on December 11th, 2016. Mr. Haar's claim note (CSAA GOINS 0316–0317) states that "the inspection revealed that the cause of loss is due to wind, hail and wind driven in rain." His note further states that "[a]ll slopes were inspected for wind and hail damage." However, Mr. Haar testified that he never examined any shingles for wind-damage during his inspection. (Haar Deposition, Page 44: Lines 2-25; Page 45: Lines 1-2; Page 66: Lines 9-14; Page 67: Lines 16-21; Page 68: Lines 12-15; Page 72: Lines 8-25; Page 73: Lines 1-16). Mr. Haar never looked underneath the shingles to determine if they were unsealed, had granular transfer, had debris blown underneath them, were properly or improperly installed, etc. Accordingly, Mr. Haar never made an assessment about the number of fasteners or placement of fasteners on the shingles, because doing so would require an adjuster to look underneath the unsealed shingles. Mr. Haar never did any assessment for wind damage despite the fact that the claim was reported as a wind claim and his own inspection of the home revealed evidence of wind damage. For example, Mr. Haar found that a section of gutters were dislodged by wind (CSAA_GOINS 0076), that an exhaust skirt on the roof had been blown up by wind allowing water to intrude into the home (CSAA GOINS 0077), and that the Goins gate had been blown off by high winds (CSAA GOINS 0082) It is inconsistent with good faith claim handling practices to fail to conduct a thorough and reasonable inspection of a loss. Mr. Haar's inspection did not consist of any examination of the shingles for wind

damage, despite the fact that the claim was reported as a wind claim and the investigation revealed evidence that the Goins home has been exposed to a high wind event on July 14th, 2016. This is completely unreasonable and is the result of CSAA's improper training and supervision of their adjusters. Mr. Haar's inspection was inconsistent with good faith claim handling practices, as it is an adjuster's duty to fully investigate, document, identify, and issue payment for all covered damages. Mr. Haar clearly stated that the cause of loss was high wind and noted collateral wind damages to the Goins' home, yet failed to conduct any investigation regarding wind damage to the Goins' shingles.

**May 15th, 2017 Re-Inspection:**

Following Mr. Haar's inspection, Mr. Goins requested a re-inspection to address the wind damage to his roof. Ryan Smith, the Goins' roofing contractor, provided photographs to CSAA showing wind damages. CSAA's adjuster Andrew Smith authored a claim note (CSAA GOINS 0313) stating "Insd contractor has provided photos showing wind damaged shingles to multiple slopes of home. We wrote a $0 estimate after the original inspection. Insd and contractor are requesting a re-inspection. After reviewing the photos it does appear that there is damage that is present on the slopes of the home that may have been missed at original inspection" and approved a re-inspection.

Mickey Manzer re-inspected the Goins roof on behalf of CSAA on May 15th, 2017. Mr. Manzer's Loss Report states:

"No additional damage was found. The previous adjuster Shane Haar had found improper shingle installation issues throughout the roof. My findings were the same. On every slope there were shingles with the left nail pulled through the shingle. In many cases these shingles only had 3 nails installed and they were over driven. Although this installation error does make this roof more susceptible to shingles being blown off the roof, there were no missing shingles, no creased shingles and no torn shingles. Therefore no physical wind damage was found to the roof and no repair recommendation is being made."

Mr. Manzer's Loss Report is factually inaccurate and his inspection and findings are not consistent with good faith claim handling standards and practices. First, Mr. Manzer's statement that "Shane Haar had found

improper shingle installation issues throughout the roof" is completely inaccurate. Mr. Haar clearly stated in his deposition that he did not conduct such an assessment and that those were not his findings. Mr. Manzer's inaccurate statement is inconsistent with good faith claim handling standards, as it is misleading and does not provide accurate information for a desk adjuster to analyze and evaluate. It leaves a false impression that Mr. Manzer verified and agreed with the findings of the first inspection, when in fact a wind damage assessment was never done by Mr. Haar and, as discussed below, never properly done by Mr. Manzer. CSAA's Claims Supervisor Cecilia Keller testified in her deposition that Mr. Manzer's Loss Report misstated Mr. Haar's findings and was inaccurate. (Keller Deposition, Rough Draft; Page 80-81).

Mr. Manzer's statement that "[i]n many cases these shingles only had 3 nails installed and they were over driven" is likewise inaccurate and misleading. Mr. Manzer's loss report and photographs state that he observed improper installation in the form of the use of too few nails throughout the roof. This is simply not true. As stated above, I personally inspected the Goins roof and did not observe a single shingle which had been installed with fewer than four nails. Mr. Manzer's false statement and mislabeling of his accompanying photographs violates good faith claim handling principles, as it fails to provide the inside adjuster with the necessary information to properly asses and evaluate the findings of the inspection. Mr. Manzer's photographs of the underside of the Goins' shingles all have notations stating: "Many shingles only had three nails and they were overdriven." I could not find one example on the roof of a shingles with fewer than four nails installed. Mr. Manzer's photographs and mislabeling is either intentional, due to carelessness, or due to lack of proper training. Regardless, it leaves an inside adjuster unequipped to do a proper and reasonable evaluation. Mr. Manzer's misstatement regarding Mr. Haar's findings, his refusal to authorize a re-inspection with a CSAA inside adjuster, and his inaccurate Loss Report and photo labels amount to unfair and unreasonable claim handling which violates good faith claim handling principles. Further, Mr. Manzer's conclusion that "there were no missing shingles, no creased shingles and no torn shingles. Therefore no physical wind damage was found to the roof and no repair recommendation is being made" is indicative of CSAA's bad faith pattern and practice of disregarding wind damaged shingles unless they are creased, torn, or blown from the roof. As discussed above, CSAA's refusal to acknowledge and adjust for repair or replacement of unsealed shingles violates good faith claim handling principles, as well as

their own estimating guidelines, because it puts the insured in the position of having to frequently bring multiple claims to address the damaged, unsealed shingles as they blow off the roof, despite the fact that unsealed shingles caused by wind (a covered peril) is direct physical loss.

CSAA's pattern and practice of disregarding wind damaged shingles unless they are creased, torn, or blown from the roof was openly acknowledged by Mr. Manzer:

> Q. And you consider, while working for AAA, direct physical loss to be torn or blown off?
>
> A. Torn, creased, direct damage to the shingle. Unsealed shingles in my opinion is not direct physical damage.
>
> (Manzer Deposition: Page 92, Lines 21-25).

However, both Mr. Haar and Ms. Keller admitted in their depositions that the policy provides coverage for direct physical loss caused by a covered peril and that unsealed shingles caused by wind is direct physical loss:

> Q. So if wind did blow up the shingles on the Goins roof and pulled them through their fastener, you would consider that to be covered damage under the terms and conditions of their policy?
>
> A. Yes.
>
> Q. Because that's direct physical loss —
>
> A. Yes.
>
> Q. -- correct?
>
> A. Uh-huh.
>
> Q. If a windstorm came through and blew the shingles of the Goins roof up and created a sealant strip adhesive transfer, you would consider that to be covered damage under the terms and conditions of the Goins policy?
>
> A. Yes.
>
> Q. Because that's direct physical loss, right?

\ Right.

(Haar Deposition: Page 108, Lines 2-18)

_____  _____    _____   _____

Q. Unsealing of the shingles by wind would be direct physical loss, correct?

A. Correct.

(Keller Deposition, Rough Draft Transcript: Page 92)

These statements are indicative of a complete lack of adjuster training and supervision by CSAA, resulting in a pattern and practice of disregarding covered wind damages to composition shingles.

Further, Mr. Manzer's conduct during the re-inspection is not consistent with good faith claim handling. Ryan Smith testified at length regarding the re-inspection with Mr. Manzer. (See Ryan Smith Deposition, Pages 36-46). Mr. Smith testified that Mr. Manzer stated, without setting foot on the Goins roof, that he could not "buy" it, because he has strict instructions to not issue payment for wind damages unless the shingles have creased, torn, or blown off the roof. Mr. Manzer stated that he had attempted to submit another claim for replacement due to unsealed shingles prior to the Goins re-inspection but that it was rejected by CSAA. This attitude is completely inconsistent with good faith claim handling practices and is indicative of a serious bad faith pattern and practice by CSAA of ignoring and refusing to adjust and issue payment for wind damaged shingles. Mr. Manzer also advised Mr. Goins that he should "change insurance carriers" and wait for another storm so that the new insurer will pay for the damages Mr. Manzer observed during his re-inspection because "[e]very other insurance company would probably buy this roof." (Ryan Smith Deposition, Page 39-40, Lines 16-25; 1-15). It goes without saying that this unsolicited "advice" is nothing short of fraudulent, completely unreasonable, and inconsistent with good faith claim handling standards and practices.

Mr. Manzer also violated good faith claim handling standards and practices by refusing Mr. Goins' and Mr. Smith's request for a third-inspection with an in-house CSAA adjuster. (Ryan Smith Deposition, Page 41-42, Lines 3-25; 1-21). A third inspection with a CSAA adjuster could have helped to resolve the claim and was requested by the insured Mr.

Manzer stated that a third inspection would not be allowed. This is unreasonable and not consistent with good faith claim handling standards.

6. In summary, having reviewed all of the information and after applying my background, knowledge, training, and experience, my opinion is that CSAA's investigation, evaluation, and lack of payment of the Goins claim is inconsistent with good faith claim handling practices and principles, and the terms and conditions of the Goins' insurance policy. If I were still a CSAA employee tasked with conducting a file review and/or audit of the Goins claim and its handling, I would rate CSAA's handling of this claim as an "F". CSAA failed to conduct a thorough, fair, and reasonable investigation of the claim. CSAA evaluated the results of their investigation unreasonably and, as part of a pattern and practice of ignoring and disregarding wind damages to laminate/composition shingles, denied the claim contrary to the policy's terms and conditions.

I declare under penalty of perjury, under the laws of the state of Nevada, that the foregoing is true and correct.

Executed this 12TH day of March, 2018.

SEAN C. PETRONZI

# Sean C. Petronzi

11345 Asilo Bianco Dr.
Las Vegas, NV 89138
(702) 240-8631 (home)
(775) 233-3333 (cellular)
E-mail: sean@summitsettlements.com

**EDUCATION**

*Bachelor of Arts in Criminal Justice*
University of Nevada, Reno; 1990

Licensed Property, Casualty and Life Broker/Agent in Nevada and multiple other reciprocal states, including Texas and Oklahoma.

President – Northern Nevada Claims Association 1996-1997
Treasurer – Northern Nevada Claims Association 1995-1996

**EXPERIENCE**

**National Catastrophe Team Lead**
California State Automobile Association
Las Vegas Regional Claim Center
January 2010 – May 2015

- Managed "pods" of 12-25 inside independent adjusters responsible for handling all incoming estimates from the field and settling with the Insureds. Handled all claims settlement approvals up to $50,000.00.
- Responsible for all internal claims count reporting and reporting of all PCS declared catastrophes to the business analytics and claim departments. CA CEA Earthquake certified.
- Handled all Department of Insurance Complaint responses for the homeowners liability and catastrophe team. Attended all bad faith depositions, as well as being deposed as the AAA corporate representative for all 30(6)b depositions.

**Settlement Consultant**
Summit Structured Settlements
July 2006 – January 2010

- Attended mediations and settlement conferences involving plaintiff and defense attorneys and work closely with claims adjusters from various large insurance carriers. Perform claim value and reserve evaluations for adjusters and assist with determining claim settlement values.
- Managed and directly oversaw a staff of 3-5 employees and assistants, including assignment of new cases and performing their job evaluations annually. Work closely with both defense and plaintiff attorneys assisting them in cases evaluations and potential settlement and trial verdict values.

**Senior Casualty Specialist**

California State Automobile Association
Las Vegas Regional Claim Center
November 2005 – July 2006

- Investigated and resolved high exposure auto accident cases which included vehicle damage appraisal and negotiating settlement of property damage and bodily injury claims with claimants directly or with their attorney.

**Senior Claims Representative**
St. Paul Fire and Marine Insurance Co.
February 1996 – June 2005

- Investigated and negotiated settlement of medical malpractice claims brought against St. Paul insured physicians and hospitals. Oversee the assignment of litigation cases to defense counsel and monitor their performance through resolution of claim.
- Handled professional medical liability and commercial general liability claims, as well as investigating excess coverage issues and cases involving potential fraud.
- Maintained one of the top three highest caseloads for the company in the thirteen states West Region.

**Independent Claims Adjuster**
R.L. Gresham & Company, Inc.
December 1994 – February 1996

- Investigated and negotiated liability claims for out-of-state insurers such as St. Paul Company, United Nations Group, Crum and Forster and Insurance Company of the West.
- Handled premise liability, property damage and auto damage claims for self insured entities which included casinos and large self-insured businesses.

**Legal Assistant**
Edward M. Bernstein and Associates
April 1992 – August 1994

- Managed and negotiated the settlement of personal injury claims prior to litigation. Supervised my secretary and front office staff.
- Dealt primarily with large insurers such as Farmers, State Farm, and Allstate on behalf of our clients.

**REFERENCES**   Excellent references available upon request.